J. Henk Taylor (016321)
**RYAN RAPP & UNDERWOOD, P.L.C.**
3200 North Central Avenue, Suite 2250
Phoenix, Arizona 85012
Telephone: (602) 707-1480
Facsimile: (602) 265-1495
Email: htaylor@rrulaw.com

*Attorneys for CWT Canada II LP, Resource Recovery Corporation and GEM Holdco, LLC*

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| In Re: | Chapter 11 |
| RDX TECHNOLOGIES CORPORATION, | Case No. 2:17-bk-14387-PS |
| Debtor | **OBJECTION TO PLAN CONFIRMATION** |

Creditors CWT Canada II Limited Partnership ("CWT"), Resource Recovery Corporation ("RRC") and GEM Holdco, LLC ("GEM" and collectively with CWT and RRC, the "Objecting Creditors"), object to the "Plan of Reorganization Dated April 4th, 2018 Proposed by the Debtor" (DE 50) (the "Plan"). For the reasons set forth below, the Plan does not satisfy the requirements of 11 U.S.C. § 1129 and thus the Court should deny confirmation.

# I. FACTUAL BACKGROUND

## A. Objecting Creditors' Claims.

### 1. Claim of CWT and RRC.

On September 7, 2016, CWT and RRC jointly obtained a judgment (the "CWT Judgment") against Debtor RDX Technologies Corporation in New York state court in a case styled *GEM Holdco, LLC v. Changing World Technologies, L.P.*, Index No. 650841/2013 (Sup. Ct. N.Y. Co.). The amount of the CWT Judgment upon entry was $7,033,491.13. With post-petition interest, the amount due on the CWT Judgment totaled at least $7,666,521.49 as of December 5, 2017 (the "Petition Date"), the date the Debtor filed its voluntary Chapter 11 petition initiating this case. The CWT Judgment is final and not subject to appeal.

CWT and RRC filed timely proofs of claim in this case based on the CWT Judgment.[1] No objection has been filed as to the CWT and RRC claims. Accordingly, CWT and RRC have a joint, allowed claim in this case in the amount of at least $7,666,521.49 as of Petition Date. This is a non-priority unsecured claim.

### 2. Claim of GEM Holdco.

On June 2, 2017, GEM obtained a judgment (the "GEM Judgment") against Debtor RDX Technologies Corporation in New York state court in a case styled *GEM Holdco, LLC v. RDX Technologies Corporation*, Index No. 653694/2015 (Sup. Ct. N.Y. Co.). The amount of the GEM Judgment upon entry was $9,023,534.49. With post-petition interest, the amount due on the GEM Judgment totaled at least $9,368,462.19 as of the Petition Date. The GEM Judgment is currently on appeal.

---

[1] Claim Nos. 13 and 14.

GEM filed a timely proof of claim in this case based on the GEM Judgment.[2] No objection has been filed as to the GEM claim. Accordingly, GEM has an allowed claim in this case in the amount of at least $9,368,462.19 as of Petition Date. This is a non-priority unsecured claim.

**B.    Debtor's Plan.**

    **1.    Classification and Treatment of Unsecured Claims.**

According to Debtor's schedules and its Disclosure Statement, Debtor does not have any secured creditors. Other than professional fees owed to Debtor's counsel and a nominal state tax debt, Debtor has only non-priority unsecured creditors.

The Plan classifies the general unsecured creditors into three classes. The claims of the Objecting Creditors are placed into Class 3 ("Litigation Unsecured Claims"). As set forth above, the combined claims of the Objecting Creditors total at least $17,034,983.70 as of the Petition Date.

The claims of "Unsecured Trade Vendors" are placed in Class 4. The Plan does not define which creditors are "Trade Vendors" with claims in this class. Debtor estimates there are $4,180,235.13 in "Trade Vendor" claims.

Finally, the Plan places the claims of "General Unsecured Creditors" in Class 5. This class "consists of all other Allowed Unsecured Claims not included in Classes 3 and 4." Debtor estimates there are $9,525,752.60 in claims in this class.

The Plan proposes identical treatment for claims in Classes 3, 4 and 5. The Plan provides the creditors in these three classes combined will receive a pro-rata share of a total distribution of $3,391,196 over a five-year period. The remainder of the claims in Classes 3, 4 and 5 will be discharged.

---

[2] Claim No. 15.

Neither the Plan nor the Disclosure Statement state why unsecured claims of equal priority are classified into separate classes, yet given identical treatment.

### 2. Equity in the Re-Organized Debtor.

It is unclear whether Debtor is proposing a new value plan. Debtor's existing equity interests are classified in Class 6. These interests will be extinguished under the Plan.

The Plan states that two entities—Induction Energy Corporation ("IEC") and Environmental Technologies Corporation ("ET")—will make capital contributions to the re-organized debtor on the effective date. Specifically, IEC will make a contribution of $500,000, while ET will make a contribution of $150,000.

The Plan provides that the re-organized debtor will "issue" 20 million shares of stock as of the effective date. In exchange for its capital contribution, IEC will receive 10 million shares in the re-organized debtor. ET will receive 3 million shares. The remaining 7 million shares are to be "held in treasury".

Notably, neither the Plan nor the Disclosure Statement:

- Provide any disclosure as to IEC and/or ET such as their business, ownership, management or financial wherewithal; or

- Explain why 7 million shares in the re-organized are being "held in treasury" and who might receive those shares in the future.

As to IEC, this is a Wyoming corporation that was formed in June 2017.[3] In its 2018 annual report, IEC identifies Elizabeth Danzik as its "President".[4] Ms. Danizk is the wife of Dennis Danzik (Debtor's former CEO) and, according to the Disclosure Statement, the owner of 6.3 percent of Debtor's shares.

---

[3] Articles of Incorporation, attached as **Exhibit A.**
[4] Annual Report, attached as **Exhibit B**.

### 3. **Exculpation/Release.**

The Plan provides the following exculpation/release:

Pursuant to the Plan, none of the Debtor, the Plan Sponsors, Official Committees, or any of their respective present or former partners, members, officers, directors, employees, advisors, attorneys or agents (collective, the "Released Parties") shall have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates, or any of their successors or assigns for any act or omission in connection with, relating to or arising out of the Chapter 11 case, any settlement related to the Chapter 11 case, the negotiation and execution of a proposed Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Estate or of the Plan, issuance and distribution of any securities issued or to be issued pursuant to the Plan, or the property to be distributed under the Plan, except only to the extent that liability is based on willful misconduct. The Released Parties shall be entitled to reasonably rely on the advice of counsel with respect to their duties and responsibilities under the Plan, or in the context of the Bankruptcy Case.

The Plan does not define who are the "Plan Sponsors" referenced in this paragraph. Likewise, neither the Plan nor the Disclosure Statement identifies the "present or former" officers, directors and employees who are being released under the Plan.

### C. **Objecting Creditors Vote To Reject Plan.**

The Objecting Creditors have timely submitted ballots voting their respective claims against the Plan.[5]

## II. OBJECTIONS

### A. **The Plan Impermissibly Gerrymanders Unsecured Claims.**

The Plan divides general unsecured claims into three separate classes. While Debtor is silent on the basis or need for this separate classification, the reason for this

---

[5] **Exhibit C**.

separate classification is not hard to discern: by placing the Objecting Creditors' claims in their own class (Class 3), Debtor seeks to isolate the rejecting votes of these claims in the hope that at least one other class of unsecured claims (Class 4 or Class 5) will vote to accept the Plan. Debtor has no creditors other than general unsecured creditors whom it can impair under a plan. Debtor is thus dependent on the affirmative vote of an unsecured creditor class to supply the necessary accepting impaired class for the purposes of Bankruptcy Code § 1129(a)(10).

Debtor knew from the outset of this case that the Objecting Creditors would be voting their claims against a plan. Debtor also knew those claims were large enough to dominate the unsecured creditor class. The Plan's separate classification of general unsecured claims is blatant effort to gerrymander an accepting impaired class for the Plan. Because such gerrymandering is not allowed under Ninth Circuit law, the Plan violates Bankruptcy Code § 1122(a) and thus fails to satisfy Bankruptcy Code § 1129(a)(1).

The Ninth Circuit has a two-step analysis for determining whether claims of equal priority have been permissibly separated into different classes. *In re Loop 76, LLC*, 465 B.R. 525, 536–37 (9th Cir. BAP 2012). First, the bankruptcy court should determine whether the claims are "substantially similar", and second, if so, whether there is a business or economic justification for separately classifying them. *Id.* If the claims are not substantially similar, their separate classification is not only permissible, but required under § 1122(a). If the claims are substantially similar, that implicates the gerrymandering concern, but the debtor may still separately classify them "if the debtor can show a business or economic justification for doing so." *Id.* (citing *In re Barakat*, 99 F.3d 1520, 1526 (9th Cir. 1996). Simply put, "a debtor cannot classify similar claims

differently in order to gerrymander an affirmative vote on a reorganization plan." *Barakat*, 99 F.3d at 1526 (quotations and citation omitted).

Here, Debtor cannot show that the claims of the Objecting Creditors are not substantially similar to those of other unsecured creditors. Debtor will no doubt point to the fact that Dennis Danzik is also a co-judgment debtor under the CTW Judgment and the GEM Judgment to argue the Objecting Creditors have a non-debtor source of payment and thus their claims are dissimilar. *In re Johnston*, 21 F.3d 323, 328 (9th Cir. 1994)(finding dissimilarity based, in part, on existence of outside source of payment); *Loop 76*, 465 B.R. at 541 (court may consider existence of third-party source for payment when analyzing whether unsecured claims are substantially similar).

But Mr. Danzik is not a likely source of repayment. Mr. Danzik is currently in bankruptcy in Wyoming; and he is hopelessly insolvent. For the existence of a third-party source of payment to distinguish a claim for Section 1122(a) purposes, the third party must provide a meaningful recovery source. *In re NNN Parkway 400 26*, 505 B.R. 277, 284 (Bankr. C.D. Cal. 2014)("[A] guaranty from an insolvent guarantor provides nothing meaningful and so it becomes a distinction without a difference and cannot alone support separate classification."); *see*, *In re Loop 76, LLC*, 442 B.R. 713, 724 (Bankr. D. Ariz. 2010)(Haines, J.)(noting that whether third-party guarantors were insolvent was relevant to whether lender's deficiency claim was substantially dissimilar). That is not the case with Mr. Danzik.

Meanwhile, Debtor's distinction between "Trade Vendors" in Class 4 and other unsecured creditors in Class 5 is even more baffling. There is no indication the claims of "Trade Vendors" would have any characteristics that would distinguish them from other unsecured creditors.

Thus the claims of the unsecured creditors in Classes 3, 4 and 5 are substantially similar. Accordingly, Debtor must demonstrate some "business or economic justification" for separately classifying these claims. *Barakat*, 99 F.3d at 1526. Debtor offers no such justification in either the Plan or the Disclosure Statement. Moreover, the fact that the Plan proposes identical treatment for all three classes of unsecured claims means, as a matter of law, that Debtor lacks a business or economic justification for this classification scheme. "[T]here is no business or economic justification for separate classification when the separately classified claims are otherwise treated the same under the plan." *FR 160 LLC v. Flagstaff Ranch Golf Club*, 2014 WL 3556356, *5 (D. Ariz., July 18, 2014)(citing *In re Montclair Retail Ctr., L.P.*, 177 B.R. 663, 665 (9th Cir. BAP 1995).

Under the Code and existing Ninth Circuit authority, the unsecured claims in this case must be grouped in one class. By dividing unsecured claims into three separate classes, Debtor is improperly seeking to gerrymander an accepting impaired class.

### B. Debtor Lacks An Accepting Impaired Class.

Debtor does not have an accepting impaired class. To confirm a Chapter 11 plan where there is at least one impaired class, the debtor must have at least one impaired class vote to accept the plan. 11 U.S.C. § 1129(a)(10). Debtor cannot satisfy this requirement.

Here, there is only one body of creditors who can provide an accepting impaired class—general unsecured creditors. When the claims of these creditors are properly grouped in a single class (see above), the class cannot vote to accept the Plan. That is

because the Objecting Creditors, with combined claims of over $17 million, can (and will) block acceptance of the Plan by unsecured creditors.

As the Court is aware, in order for a class to accept a plan, more than 50 percent in number and two-thirds in amount of the claims voting on the plan must vote to accept the plan. 11 U.S.C. § 1126(c). According to the Plan and Disclosure Statement, the entire universe of unsecured claims outside of the Objecting Creditors totals $13.7 million in amount. Even if all these claims voted to accept the Plan, their votes would still not be enough for the unsecured creditor class to accept the Plan in light of the Objecting Creditors' votes to reject the Plan. A negative vote by $17 million in unsecured claims plainly prevents two-thirds in amount from accepting the Plan.

Thus confirmation must be denied because Debtor cannot satisfy Bankruptcy Code § 1129(a)(10).[6]

### C. Debtor Has Not Satisfied Bankruptcy Code § 1129(a)(5).

Debtor has not fully disclosed its post-confirmation management. Moreover, allowing Tony Ker to serve as CEO of the re-organized debtor is not consistent with the best interests of the largest creditors in this case—CWT, RRC and GEM.

Debtor must fully disclose "the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer or voting trustee of the debtor . . . or a successor of the debtor under the plan." 11 U.S.C. § 1129(a)(5)(A)(i). Moreover, the appointment or continuance in office of any such individual must be "consistent with interests of creditors." 11 U.S.C. § 1129(a)(5)(ii). Here, Debtor has disclosed only two individuals who will be involved in the re-organized debtor's operations: Tony Ker and Dennis Danzik.

---

[6] Objecting Creditors reserve the right to supplement this objection based upon the actual voting on the Debtor's Plan.

As to Mr. Danzik, the Plan states he will be paid as a consultant, so he technically does not fall under the purview of Section 1129(a)(5)(A). Nonetheless, given Mr. Danzik's theft of millions of dollars from CWT and RRC, and his $9 million liability to GEM, Mr. Danzik's continued involvement with the re-organized debtor is clearly contrary to the interests of the Objecting Creditors.

Meanwhile, Tony Ker is proposed as the CEO of the re-organized debtor. As such, Mr. Ker's continued management of the debtor is subject to Section 1129(a)(5)(A), and it is plainly inconsistent with the interests of the Objecting Creditors. CWT and RRC are currently suing Mr. Ker in Arizona District Court[7] based on his facilitating Mr. Danzik's theft of millions of dollars of tax credits belonging to CWT and RRC. Likewise, Mr. Ker was involved in Debtor's management at the time of the actions resulting in GEM's $9 million judgment against Debtor.

Other than Mr. Ker, Debtor has not disclosed any other officers who will participate in management of the re-organized debtor. It is hard to believe that if the re-organized debtor does the kind of business projected in the Disclosure Statement that Mr. Ker will be able to manage the re-organized debtor on his own.

Even more troubling, Debtor has not disclosed any of the proposed directors of the re-organized debtor. Presumably (a) the re-organized debtor will have a board of directors and (b) IEC and ET will be appointing those directors based on their ownership of the re-organized debtor's equity. Bankruptcy Code § 1129(a)(5)(A)(i) requires the disclosure of these directors' "identity and affiliations". This is particularly important in regards to any directors appointed by IEC—an insider entity controlled by Mr. Danzik's wife.

---

[7] *CWT Canada II Limited Partnership, et al. v. Danzik, et al.*, case no. 2:16-cv-00607-PHX-DGC (consolidated actions).

Finally, the existence of 7 million shares of "treasury" stock in the re-organized debtor is troubling. Nothing under the Plan restricts the re-organized debtor from distributing these shares immediately after plan confirmation. Whoever ends up holding these shares may be entitled to appoint one or more directors to the re-organized debtor's board. If that were to happen, the Objecting Creditors would have no ability to object to such directors under Section 1129(a)(5)(A).

**D.    The Plan Is Not Feasible.**

"To confirm a plan, a bankruptcy court must find that the plan is feasible, meaning that "[c]confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor." *In re Harbin*, 486 F.3d 510 (9th Cir. 2007); 11 U.S.C. § 1129(a)(11). This Plan is very likely to fail.

Debtor has no assets. The "proprietary technology" that Debtor touts as the engine of its recovery is apparently worthless without Mr. Danzik's involvement. Yet Debtor has no commitment from Mr. Danzik to provide any services after confirmation. The reality is that the "proprietary technology" (whatever that may be) is really Mr. Danzik's asset—not Debtor's.

Nonetheless, the Plan proposes to pay unsecured creditors almost $3.4 million over the course of 5 years. Debtor has not offered any evidence, other than self-serving cash flow projections from Mr. Ker, to demonstrate that the re-organized debtor will produce revenues in excess of costs sufficient to make these distributions to unsecured creditors. Given Debtor has not been operating for years, it has no pre-petition track record of performance. According to the Debtor's operating reports, it has not produced one penny of revenue in the six months since it filed bankruptcy. But the Debtor

unabashedly predicts it will generate $2.5 million in total revenue in year 1 following confirmation. Hogwash.

Absent evidence of an actual action plan showing just what specific steps Debtor will take to "flip a switch" and start generating revenues when it has not been able to do so for years, the Court should place great weight on evidence of actual operations in evaluating future projections. *See In re Schriock Constr., Inc.,* 167 B.R. 569, 577 (Bankr. D.N.D. 1994) (past performance is the best guide for future projections where debtor does not materially change its operations) and *In re Trevarrow Lanes*, 183 B.R. 475, 482 (Bankr. E.D. Mich. 1995) (earnings projections in excess of pre-bankruptcy earnings not credible where no evidence of material change in operations). Here, the evidence of "actual operations" is non-existent. Debtor's financial projections are pure fantasy.

Meanwhile, there is no proof that IEC and ET have the ability or intent to actually make the $650,000 in capital contributions required under the Plan. The Disclosure Statement says nothing about these companies' business or financial wherewithal. Nor has Debtor offered any document that purports to obligate IEC or ET to make the effective date payments. No term sheet. No commitment. No subscription agreement.

Objecting Creditors should not have to expend time and money in discovery disproving feasibility simply because Debtor files an unsupported plan. Rather, Debtor should have to make at least a *prima facie* showing that it can perform under the Plan. It has not done that in regards to its financial projections. Nor has it shown the capital contributions from IEC and ET are real.

### E. The Plan Has Not Been Proposed in Good Faith.

In order for a plan to be confirmed, it must be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3); *see also In re Padilla*, 222 F.3d 1184 (9th Cir.2000) (Bankruptcy Code "permits a court to confirm a payment plan only if it is proposed in good faith" citing 11 U.S.C. § 1129(a)(3)). This requires that "the plan be proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code." *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001) (internal quotations omitted); *Linda Vista Cinemas*, 442 B.R. at 735 (good faith "requires the plan to achieve a result consistent with the objectives and purposes of the Bankruptcy Code" and requires that court inquire into "circumstances surrounding the plan" and "application of the principles of fundamental fairness in dealing with creditors").

Here, Debtor's lack of good faith is evident:

- Debtor filed this bankruptcy to avoid discovery in aid of execution of the CWT Judgment.

- Debtor has no assets, other than "proprietary technology" that is yet undefined and apparently worthless without Mr. Danzik being available to implement it.

- Debtor is offering only a 10 percent distribution on unsecured claims while at the same time selling the equity in the re-organized debtor for an amount equal to only 2.5 percent of the debt being discharged.

- Debtor fails to disclose the ownership and officers of the two entities acquiring the re-organized debtor's equity (IEC and ET), thus making it impossible to determine whether these entities are "insiders".

- Debtor has not produced any commitment or agreement from IEC or ET showing they are bound to make the capital contributions under the Plan.

- The Plan proposes to pay Mr. Ker $300,000 and Mr. Danzik $925,000 over the course of five years for services that apparently provided no value to Debtor pre-petition, and have generated zero revenues post-petition.

- Debtor claims it will generate post-confirmation total revenue of $2.5 million in year 1, and $6.5 million in year 5, when Debtor has generated no revenue for years, including zero dollars in the over six months that it has been in bankruptcy.

At the end of the day, this case is nothing more than a dispute between three aligned creditors—CWT, RRC and GEM—holding $17 million in judgment claims on the one hand and Debtor on the other. Though Debtor claims it has over 300 creditors with $31 million in claims, no creditors other than CWT, RRC and GEM have appeared to date in this case. Moreover, other than the Objecting Creditors, only 12 creditors have filed proofs of claim totaling $162,658.12 in this case. The filing of this case at the outset, and the Plan's proposed discharge of the Objecting Creditors $17 million in claims based on unsupportable financial projections, evinces a lack of good faith.

### F. The Release/Exculpation is Too Broad.

A nonconsensual release of one nondebtor's claims against another nondebtor is not permitted by the Bankruptcy Code. *See Stratosphere Litig. L.L.C. v. Grand Casinos, Inc.*, 298 F.3d 1137, 1143 (9th Cir. 2002) ("[A] bankruptcy court cannot confirm a reorganization plan that discharges the liabilities of a third party."); *In re Lowenschuss*, 67 F.3d 1394, 1402 (9th Cir. 1995) ("This court has repeatedly held, without exception, that [11 U.S.C.] § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors."); *In re S. Edge LLC*, 478 B.R. 403 (D. Nev. 2012). The Ninth Circuit has rejected the argument that "the general equitable powers

bestowed upon the bankruptcy court by 11 U.S.C. § 105(a) permit the bankruptcy court to discharge the liabilities of non-debtors." *Lowenschuss*, 67 F.3d at 1402.

Here, it is unclear whether the Plan seeks to release claims against non-debtors, specifically Messrs. Ker and Danzik, Ms. Danzik and Richard Carrigan (a former director of Debtor). The Plan provides a release of any claims against "Debtor, the Plan Sponsors, . . . or any of their respective present or former . . . officers, directors, employees . . . or agents . . . relating to or arising out of the Chapter 11 case." While this provision appears to be an exculpation clause for bankruptcy-related actions, the language "relating to . . . the Chapter 11 case" is quite broad. Arguably, any claim filed by the Objecting Creditors "relates to" the Chapter 11 case. Thus any liability of a non-debtor individual or entity related to the Objecting Creditors' claims against Debtor could be deemed released by this Plan. Likewise, the "Plan Sponsors" are not defined and their officers not disclosed, so there is no way to tell how far this release goes.

The Plan's release/exculpation clause must be revised to, at a minimum, make clear that the liability of Messrs. Ker, Danzik, Carrigan and Ms. Danzik, as well as any other present or former officer, director or employee of Debtor, for their pre-petition actions unrelated to this Chapter 11 case is not released or otherwise affected by the Plan or confirmation of the Plan.

### G. The Plan Does Not Provide Fair and Equitable Treatment of Objecting Creditors' Claims.

Objecting Creditors' claims are impaired by Debtor's Plan. Objecting Creditors' ballots rejecting Debtor's Plan were timely filed. Accordingly, Debtors' Plan fails to satisfy § 1129(a)(8) as to Objecting Creditors' claims. In order to be confirmed over Objecting Creditors' objection, Debtor's Plan's treatment of the claims must satisfy §

1129(b), including that it be fair and equitable, as well as satisfy the absolute priority rule. Debtor's Plan does neither.

Section 1129(b)(2) sets forth only the minimum standards of a "fair and equitable" plan. The requirements of § 1129(b)(2) are not exclusive and the statute does not require that every plan not prohibited be confirmed. *See e.g.*, *Sandy Ridge Dev. Corp. v. Louisiana Nat'l Bank*, 881 F.2d 1346, 1352 (5th Cir. 1989); *Aetna Realty Inv. Inc. v. Monarch Beach Venture, Ltd.*, 166 B.R. 426, 434 (C.D. Cal. 1993). As indicated in the Congressional history to § 1112(b):

> Although many of the factors interpreting 'fair and equitable' are specified in paragraph (2), others, which were explicated in the description of section 1129(b) in the House report, were omitted from the House amendment to avoid statutory complexity and because they would undoubtedly be found by a court to be fundamental to 'fair and equitable' treatment of a dissenting class.[8]

In other words, "a court must consider the entire plan in the context of the rights of creditors under state law and the particular facts and circumstances when determining whether a plan is 'fair and equitable'." *Federal Sav. & Loan Ins. Corp. v. D & F Constr., Inc. (In re D & F Const., Inc.)*, 865 F.2d 673, 675 (5th Cir. 1989).

### 1. If the Plan is a New Value Plan, the New Value is Not Substantial Enough.

Debtor has not disclosed the ownership and officers of IEC and/or ET. So there is no way for Objecting Creditors to know whether one or both of these entities are in fact controlled by Debtor's old equity. What information is available on IEC, for example, indicates this entity is controlled by old equity (Ms. Danzik). Likewise, neither the Plan nor the Disclosure Statement explain how and to whom the 7 million "treasury" shares in the re-organized debtor will be distributed.

---

[8] 124 Cong. Rec. 32,407 (1978).

It is thus possible that the Plan is a disguised new value plan. If that is the case, then the Plan fails to satisfy the requirements of the new value exception to the absolute priority rule. To satisfy the new value exception, Debtor must prove that the new value is "'1) new, 2) substantial, 3) money or money's worth, 4) necessary for a successful reorganization and 5) reasonably equivalent to the value or interest received.'" *In re Red Mountain Mach. Co.*, 448 B.R. 1 (Bankr. D. Ariz. 2011) (citation omitted).

Here, a capital contribution of $650,000 does not satisfy the "substantial" requirement. According to Debtor, the Plan will discharge $31 million in unsecured debt. A contribution of $650,000 amounts to 2 percent of that total debt. That is not "substantial". *In re Sovereign Group 1985-27, Ltd.*, 142 B.R. 702, 710 (Bankr. E.D. Pa. 1992)(new value contribution equating to 3.6 percent of all unsecured claims in case not "substantial"). Meanwhile, the Plan does not require any new value contribution for distribution of the 7 million shares of treasury stock.

### 2. The Plan is Not Otherwise "Fair and Equitable" as to Objecting Creditors.

Even if the Plan is not technically a new value plan because IEC and ET are not old equity, the Plan is not fair and equitable to Objecting Creditors. Again, the Plan proposes to discharge $17 million in claims owed to Objecting Creditors while distributing 65 percent of the equity in the re-organized debtor to two unknown entities for an inconsequential contribution. At the same time, the Plan reserves 35 percent of the equity in the re-organized debtor to be distributed at an unknown time to unknown persons or entities. Indeed, there is nothing to prevent the re-organized debtor's board (whoever that may be) from distributing these treasury shares to old equity holders for no contribution at all.

## III. CONCLUSION

For the foregoing reasons, Objecting Creditors object to the Plan and respectfully request the Court deny confirmation.

RESPECTFULLY SUBMITTED this 10th day of July, 2018.

                                    RYAN RAPP & UNDERWOOD, PLC

                                    By /s/ J. Henk Taylor (016321)_____
                                        Henk Taylor
                                     *Attorneys for CWT Canada II LP, Resource Recovery Corporation and GEM Holdco, LLC*

**ORIGINAL** e-filed and a **COPY** of the foregoing e-mailed this 10th day of July, 2018 to:

Mark Giunta
LAW OFFICE OF MARK GIUNTA
531 East Thomas Road, Suite 200
Phoenix, AZ 85012
markgiunta@giuntalaw.com
*Counsel to Debtor-In-Possession*

Christopher J. Pattock
OFFICE OF THE US TRUSTEE
230 N. First Ave., Suite 204
Phoenix, AZ 85003
christopher.j.pattock@usdoj.gov

/s/ Henk Taylor