1  Robert R. Kinas (AZ Bar No. 011560)
   SNELL & WILMER L.L.P.
2  3883 Howard Hughes Parkway, Suite 1100
   Las Vegas, NV 89169
3  Telephone: (702) 784-5200
   Facsimile: (702) 784-5252
4  Email: rkinas@swlaw.com

5  Emily Greer Gildar Wagner (#028811)
   SNELL & WILMER L.L.P.
6  One Arizona Center
   400 E. Van Buren, Suite 1900
7  Phoenix, Arizona 85004-2202
   Telephone: 602.382.6000
8  Facsimile: 602.382.6070
   E-Mail: ewagner@swlaw.com
9  Attorneys for Butterball, LLC

10

11          **IN THE UNITED STATES BANKRUPTCY COURT**

12              **FOR THE DISTRICT OF ARIZONA**

13

| | |
|---|---|
| 14  In Re: | Proceedings Under Chapter 11 |
| 15  RDX TECHNOLOGIES CORPORATION, | Case No. 2:17-bk-14387-PS |
| 16         Debtor. | **NOTICE OF FILING EXHIBITS TO LIMITED OBJECTION TO CONFIRMATION OF DEBTOR'S PLAN OF REORGANIZATION** |
| 17 | |
| 18 | Date:      July 17, 2018 |
| 19 | Time:      11:00 a.m. (Arizona) Location: 230 N. 1st Ave. |
| 20 |            Phoenix, AZ 85003 Courtroom 601 |
| 21 | |
| 22 | Related DE(s):    94 |

23          NOTICE IS HEREBY GIVEN that the Exhibits to Butterball, LLC's *Limited*

24  *Objection to Confirmation of Debtor's Plan of Reorganization* (the "Plan Objection,"

25  Docket Entry # 94) were inadvertently omitted from the filing, and are attached hereto as

26  Exhibits A and B.  The Exhibits are incorporated by reference into the Plan Objection.

27

28

4824-3692-9133

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
602.382.6000

RESPECTFULLY SUBMITTED this 11th day of July, 2018.

SNELL & WILMER L.L.P.

By: /s/ Emily Wagner
Robert R. Kinas (#011560)
3883 Howard Hughes Pkwy, Ste. 1100
Las Vegas, NV 89169

Emily Greer Gildar Wagner
One Arizona Center
400 E. Van Buren St., Suite 1900
Phoenix, AZ  85004-2202

*Attorneys for Butterball, LLC*

**E-FILED** this 11th day of July 2018, and
**COPIES** served by email on the following:

Mark J. Giunta
Law Office of Mark J. Giunta
531 E. Thomas Rd., Ste. 200
Phoenix, AZ 85012
markgiunta@giuntalaw.com
Attorney for the Debtor

Christopher J. Pattock
Office of the U.S. Trustee
230 N. First Ave., Ste. 204
Phoenix, AZ 85003
christopher.j.pattock@usdoj.gov
U.S. Trustee

J. Henk Taylor
Ryan Rapp & Underwood, P.L.C.
3200 N. Central Ave., Ste. 2250
Phoenix, AZ 85012
htaylor@rrulaw.com
Attorneys for CWT Canada II LP,
Resource Recovery Corporation,
Jean Noelting, GEM Holdco, LLC,
and GEM Ventures, Ltd.

Joshua Wurtzel
Jeffrey M. Eilender
Bradley J. Nash
Schlam Stone & Dolan LLP
26 Broadway
New York, NY 10004
jwurtzel@schlamstone.com
jeilender@schlamstone.com
bnash@schlamstone.com
Attorneys for CWT Canada II Limited
Partnership and Resource Recovery
Corporation

/s/ Mary J. Minnick

4824-3692-9133

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202
602.382.6000

# EXHIBIT A

# EXHIBIT A

# GROUND LEASE AGREEMENT

GROUND LEASE AGREEMENT (this "Lease"), dated as of _APRIL 3_, 2002 between **CONAGRA POULTRY COMPANY**, a Delaware corporation, whose address is One ConAgra Drive, Omaha, Nebraska 68102 ("Lessor"), and **RENEWABLE ENVIRONMENTAL SOLUTIONS, LLC** a Delaware limited liability company, whose address is 2001 Butterfield Road, Downers Grove, Illinois 60515, ("Lessee").

## Preliminary Statements

Lessor is the owner in fee simple of certain land located in Jasper County, Missouri, consisting of approximately 2.8 acres and legally described in Exhibit "A" attached hereto and incorporated by reference herein (the "Premises").

Lessor desires to lease the Premises to Lessee, and Lessee desires to lease the Premises from Lessor, subject to and in accordance with the provisions of this Agreement. The Premises also includes non-exclusive rights to all easements benefiting the Premises.

## Agreement

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements herein set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each party hereto, Lessor and Lessee hereby agree as follows:

1. **Lease of Premises.** Lessor hereby leases the Premises to Lessee upon the terms and conditions contained herein.

2. **Term.** The term of this Lease shall be as follows:

(a) **Commencement Date.** The commencement of this Lease for purposes of commencement of the parties' rights and obligations hereunder shall be April 3, 2002 (the "Commencement Date").

(b) **Primary Term.** The primary term of this Lease shall be twenty-five (25) years from the Commencement Date, unless sooner terminated according to the terms and conditions contained herein.

(c) **Renewal Options.** Provided Lessee has not then committed at act of material default which has not yet been cured pursuant to Section 14 below, Lessee shall have the option to renew and extend this Lease for five (5) additional terms of five (5) years each, upon the same terms and conditions, except for rental, as provided herein, by giving Lessor written notice of Lessee's election at least six (6) months prior to the expiration of the then current primary or renewal term.



(d)     <u>Termination.</u> Notwithstanding the provisions for the term of this Lease as set forth above, in the event Lessee is unable to operate the recycling process reasonably effectively or with reasonable economic success, Lessee may terminate this Lease upon six (6) months written notice to the other.

3.     <u>Rent.</u> Rent payable to Lessor by Lessee under this Lease shall be as follows:

(a)     <u>Primary Term Rent.</u> Lessee shall pay Lessor as annual rental for the Premises for the primary term of this Lease the sum of Fifteen Thousand and 00/100 Dollars ($15,000.00) (the "Rent"), which sum is payable in twelve (12) equal installments monthly in advance starting on the Commencement Date and on the first day of each successive calendar month thereafter for the term of this Lease.

(b)     <u>Renewal Term(s) Rent.</u> Lessee shall pay Lessor as annual rental for the Premises during the renewal term(s) of this Lease, for each renewal term exercised by Lessee, the sum of Fifteen Thousand and 00/100 Dollars ($15,000.00) annually for each renewal term, payable in twelve (12) equal installments monthly in advance in like manner as the Rent for the primary term.

4.     <u>Access Road.</u> The Premises, which are a part of a larger parcel, do not have their own tax identification number or direct access to a public roadway. During the term of this Lease, Lessor grants to Lessee, to the extent of Lessor's authority to do so, a non-exclusive right of ingress and egress to and from the Premises and Main Street over the property described on <u>Exhibit "B"</u> attached hereto and incorporated herein by reference (the "Access Road"). Within eight (8) months after the Commencement Date Lessee shall pave the Access Road. Lessee acknowledges that such Access Road may include areas to which Lessor does not own fee simple title or over which certain third parties may have rights, including an area which is subject to a railroad right of way or owned by a railroad.

5.     <u>General Intent of Ground Lease.</u> Except as expressly provided herein, during the term of this Lease Lessor shall have no responsibility with respect to the Premises, including, but not limited to, the payment of any costs or expenses for the use, operation or maintenance of the Premises or any improvements thereon, the payment of real estate taxes or assessments, special or otherwise, or utilities or insurance costs or the compliance with any laws, ordinances or regulations relating to the Premises. All obligations with respect to the Premises, except as expressly provided herein, shall be Lessee's.

6.     <u>Use of Premises.</u> Lessee shall use the Premises for the construction and operation of a recycling facility and related purposes, in a manner that does not violate laws, covenants or restrictions applicable to the Premises. Lessee shall not use the Premises or any part thereof for any purpose other than that permitted herein, without the written consent of Lessor, which may be withheld for any reason.

Page 2 of 22

7.    _Utilities._  Lessee shall pay for all utilities to the Premises, including, but not limited to, telephone, gas, water, electricity, storm sewer, and sanitary sewer. Lessor makes no representation or warranty as to the availability of any utilities to the Premises. If Lessee seeks to install any utility connections to the Premises, such utilities shall be installed, at Lessee's expense, in the area on which the Access Road is located, or on such other location approved by Lessor, in Lessor's sole discretion.

8.    _Compliance with Law._  During the term of this Lease, Lessee shall, at Lessee's sole cost and expense, comply promptly with all applicable environmental statutes, laws, ordinances, regulations, and requirements ("Environmental Laws") and any other applicable laws (collectively, "Legal Requirements") in effect during the term of this Lease applicable to the Premises, and Lessee's activities and operations thereon.

Lessee shall cause any and all Hazardous Materials discharged or removed from the Premises during the term of this Lease to be removed and transported solely by duly licensed haulers to duly licensed facilities for final disposal of such materials and wastes. Lessee shall in all respects handle, treat, deal with and manage any and all Hazardous Materials in, on, under or about the Premises in total conformity with all applicable Environmental Laws and prudent industry practice regarding management of such Hazardous Materials during the term of this Lease. Upon expiration or earlier termination of the term of this Lease, Lessee shall cause all Hazardous Materials brought to the Premises during the term of this Lease by anyone other than Lessor or Lessor's officers, directors, employees or agents, to be transported for use, storage or disposal in accordance with the compliance with all applicable Environmental Laws. For purposes of this Lease, "Hazardous Materials" means any substance or material regulated or governed by an Environmental Law.

Lessee shall not use or permit the Premises to be used in any manner that will create waste of the Premises or cause a nuisance.

Lessee's obligations under this Section 8 shall include, without limitation, all costs and work or obligations of any governmentally required or necessary environmental investigation and cleanup of the Premises related to Lessee's use or operation of the Premises. The provisions of this Section shall survive the expiration or earlier termination of the term of this Lease.

Lessor shall conduct environmental testing of the soils, groundwater, or both, of certain parts of the Premises selected by Lessor within sixty (60) days after the Commencement Date. If any Hazardous Materials are found in levels that require report or remediation, Lessor shall take whatever action is required of Lessor by law with respect to such Hazardous Materials, and Lessee shall have no obligation to report or remediate any such Hazardous Materials, unless Lessee or its agents or contractors are found to have caused the presence of such Hazardous Materials. At the expiration or termination of this Lease, Lessor shall complete, at Lessee's expense, additional environmental testing of the soil, groundwater, or both, in areas of the Premises selected by Lessor, and Lessee shall report and remediate any Hazardous Materials that are found by such testing, at the expense of Lessee, except for any Hazardous Materials found to have been released by Lessor.

Page 3 of 22

9.    Maintenance and Repairs.  Once Lessee has constructed any improvements on the Premises, Lessee shall, at its own expense, perform all maintenance and repairs on the Premises and Access Road necessary to keep the Premises including such improvements in a safe condition and in compliance with all applicable laws and regulations, including ordinary repairs and maintenance as well as maintenance and repairs to the foundation, support columns, beams, walls, roof, utility and service systems, and replacement of heating, air conditioning, water heating or similar equipment, such other structural repairs and replacements and maintenance relating to any improvements now existing or hereafter placed on or at the Premises.  Lessee shall at all times keep the Premises and the Access Road free of trash, debris, junk, derelict vehicles and derelict equipment, and shall keep all buildings and improvements hereafter constructed on the Premises in safe condition and repair.  Lessor shall have no obligation to make any repairs or conduct any maintenance on the Premises.

10.    Indemnity.

10.1    Insurance Requirements.  For purposes of the following indemnity, Lessee agrees during the term hereof to maintain public liability and other insurance with reputable insurance companies, and shall furnish Lessor within one (1) week after obtaining such insurance or any renewals thereof, with certificates of insurance properly executed by Lessee's or its insurance companies evidencing such fact, giving at least one (1) month prior written notice to Lessor in the event of cancellation or material alteration of such coverage.  The insurance coverage to be maintained by Lessee shall name Lessor as an additional insured and shall include comprehensive general liability insurance, with blanket contractual liability endorsement, against claims for bodily injury, death and property damage arising out of Lessee's operations or occurring on or about the Premises or the Access Road affording minimum single limit protection of Five Million Dollars ($5,000,000) with respect to personal injury or death and property damage occurring or resulting from one occurrence, workers' compensation insurance in accordance with applicable state requirements, business auto liability insurance with protection not less than $2,000,000 per occurrence, and, during any period of construction by Lessee of improvements on the Premises or the Access Road builder's risk insurance as required below. Additionally, Lessee shall maintain a pollution liability insurance policy, which shall cover on-site and off-site clean-up costs, third party bodily injury or property damage, any other loss or claim, arising from a discharge, dispersal, release or escape related to the Premises of any solid, liquid, gaseous or thermal irritant or contaminant, including, but not limited to, smoke, vapors, soot, fumes, acids, toxic chemicals, and waste materials into or upon land, atmosphere, or any watercourse or body of water, including groundwater.  The minimum limits of this policy shall be $2,000,000 per occurrence. Lessor shall be named as an additional insured under such pollution liability insurance policy, which shall be primary as respects any other insurance available to Lessor.   If Lessee constructs any improvements on the Premises, Lessee shall, upon completion of such improvements, keep such improvements, structures and fixtures on the Premises insured against loss by an "all-risk" property insurance policy in an amount sufficient to prevent Lessee from being a co-insurer under the terms of the applicable policies, but in any event in an amount not less than ninety percent (90%) of the full replacement value of such improvements, structures and

Page 4 of 22

fixtures, as determined from time to time. Lessor shall be named as a loss payee under such all-risk insurance policy solely with respect to the debris removal and cleanup coverage to be included in such policy, provided in the event Lessee proceeds to cleanup and remove any debris from any casualty in connection with Lessee's reconstruction of the improvements on the Premises, Lessor shall assign to or pay to Lessee any proceeds under such policy paid to Lessor for such cleanup or removal.

10.2    Indemnity by Lessee.  Lessor shall not be responsible or liable for any damage or injury to any property or to any person or persons at any time on the Premises or Access Road; nor shall Lessor be in any way responsible or liable for any violation of Legal Requirements (including, but not limited to, Environmental Laws) pertaining to the Premises or the Access Road during the term of this Lease; and Lessee agrees that it will not hold Lessor in any way responsible or liable therefor.  Lessee shall indemnify and hold harmless each Lessor Party (as hereinafter defined) against and from all liabilities (statutory or otherwise) and any and all claims, liabilities, demands, costs and expenses (including attorney fees and expenses) and judgments of any nature (collectively, "Claims") by and on behalf of any person for any Claims incurred as owner of the Premises or the Access Road, including, but not limited to, Claims arising from any work or thing whatsoever done in and on the Premises or the Access Road, and shall also indemnify and hold harmless each Lessor Party against and from any and all Claims arising from the operation and any condition of the Premises or the Access Road, during the term of this Lease, or arising from any breach or default on the part of Lessee in the performance of any covenant or agreement on the part of Lessee to be performed pursuant to this Lease, or arising from any act or negligence of Lessee, or of its or their agents, contractors, employees, licensees or invitees, or arising from any accident, injury or damage whatsoever caused to any person or property occurring during the term of this Lease in or about the Premises or the Access Road, and from any spill, leak, release or deposit of any materials or substances (including Hazardous Materials) originating from the Premises onto property other than the Premises.  In the event any action or proceeding is brought against a Lessor Party by reason of any such Claim, Lessee shall pay all expenses incurred by such Lessor Party in defending such action or proceeding.  The foregoing indemnification of each Lessor Party by Lessee shall not apply to the extent that any damage or loss is caused by the negligence (other than arising from Lessor's failure to take any act with respect to the Premises), unlawful or wrongful act of a Lessor Party or any of their respective agents, employees or invitees, except where the alleged negligent, unlawful or wrongful act of Lessor arose out of a condition on or at the Premises which was Lessee's obligation to prevent or remedy in the first instance.  The parties acknowledge that the relationship between Lessor and Lessee is solely as Landlord and Tenant and that Lessor and Lessee shall in no event be deemed to be an agent, partner or affiliate of each other in connection with the activities conducted by Lessee at the Premises or the Access Road, or otherwise, except as otherwise expressly provided herein.  For purposes hereof, the term "Lessor Party" means, collectively, Lessor and Lessor's shareholders and their respective affiliates and the directors, officers, agents, employees, licensees and invitees of any of the foregoing.

11.    Surrender.  Lessor acknowledges that pursuant to this Lease Lessor has no right, title, interest or claim in any buildings, fixtures or other equipment placed on the Premises by or on behalf of Lessee.  On the last day of the term of this Lease, Lessee shall surrender the Premises and

Page 5 of 22

the Access Road to Lessor in good and safe condition; provided, Lessee shall, at Lessee's expense, remove the building, other improvements, and any and all of its equipment or fixtures from the Premises. Any buildings, fixtures or other improvements which are not removed at the end of the term or within four (4) months after such termination date shall, at Lessor's election, be disposed of by Lessor or become the sole property of Lessor at Lessee's expense. With respect to the Access Road and any utilities installed by Lessee, Lessor shall advise Lessee upon termination of this Lease whether Lessee must remove any such items, and Lessee shall remove any such items as directed by Lessor and leave any such items as directed by Lessor. If Lessee shall require additional time at the end of the term of the Lease in which to remove its equipment or any improvements on the Premises, Lessee shall have the right to take up to four (4) months to remove such equipment or improvements, upon written notice to Lessor, sent not more than seven (7) days after the termination or expiration of the Lease, in which event Lessee's obligations hereunder, including the obligations to pay rent, maintain the Premises and carry insurance, shall survive for such four (4) month period.

　　　　12.　　Eminent Domain. If any part of the Premises shall be taken by any public authority under the power of eminent domain, then this Lease shall terminate as to the part of the Premises taken upon the date of taking by such public authority. Lessor may appoint Lessee as Lessor's agent for the purpose of handling or contesting eminent domain proceedings, using legal counsel approved in writing by Lessor. Lessor shall not be required to join in any proceeding or contest brought by Lessee unless the provisions of any law requires that such proceedings or contests be brought by or in the name of Lessor or any owner of the Premises, however, Lessee shall keep Lessor contemporaneously advised of all material facts and developments pertaining to the proceedings or contest. In such case, Lessor shall join in the proceeding or contest or permit it to be brought in Lessor's name as long as Lessee reimburses Lessor for all costs associated with such proceeding or contest. Lessor, at Lessee's sole cost and expense, shall cooperate fully with any reasonable request of Lessee in order to bring any such contest or proceeding to a successful conclusion. Lessor shall have no right to receive any portion of the condemnation award made for Lessee's buildings, fixtures and improvements on the Premises, and Lessee shall have no right to receive any portion of the condemnation award made for the Premises (including the value of any leasehold interest). Nothing herein shall prevent Lessor from participating in any condemnation proceedings relating to portions of the Premises other than Lessee's buildings, fixtures and improvements on the Premises.

　　　　13.　　Taxes. Lessee shall pay before delinquent all real and personal property taxes and ad valorem taxes that are levied against the Premises, the buildings or other improvements on the Premises, and all personal property installed or located in or about the Premises, which are assessed for any year during the term of this Lease. If any such taxes shall cover any period of time prior to or after the expiration of the term hereof, Lessee's share of such taxes shall be equitably prorated to cover only the period of time within the tax fiscal year during which this Lease shall be in effect, and Lessor shall reimburse Lessee to the extent required. If the Premises are not taxed as a separate tax parcel, then the taxes for the tax parcel of which the Premises are a part shall be equitably divided between Lessor and Lessee based on the assessments of the different components of the taxes, with the land component divided based on land area. Lessor shall cooperate with any efforts

Page 6 of 22

by Lessee to have the Premises taxed as a separate tax parcel, although Lessee shall not be required to incur any cost in connection with such cooperation or efforts.

Lessee, at its cost, shall have the exclusive right, at any time and in accordance with law, to seek a reduction in the assessed valuation of the Premises or any improvements placed thereon, or to contest any real or personal property taxes that are to be paid by Lessee. If Lessee seeks a reduction or contests such property taxes, the failure on Lessee's part to pay the property taxes shall not constitute a default as long as Lessee complies with the provisions of this Section. Lessor agrees to forward to Lessee copies of any tax notices or statements relating to ad valorem and other taxes to be paid by Lessee immediately upon receipt by Lessor. Lessor and Lessee also agree to respond in a timely manner to provide the information that may be required of Lessor or Lessee to the Jasper County Assessor pursuant to applicable state law.

Lessor shall not be required to join in any proceeding or contest brought by Lessee unless the provisions of any law require that the proceedings or contests be brought by or in the name of Lessor or any owner of the Premises, however, Lessee shall keep Lessor contemporaneously advised of all material facts and developments pertaining to the proceedings or contest. In that case Lessor shall join in the proceeding or contest or permit it to be brought in Lessor's name as long as Lessee reimburses Lessor for all costs associated with such proceeding or contest. Lessor, at Lessee's sole cost and expense, shall cooperate fully with Lessee in order to bring any such contest or proceeding to a successful conclusion. Lessor, at Lessee's sole cost and expense, also agrees to supply Lessee with any relevant information, documents and pertinent data in Lessor's possession or control as may be reasonably requested by Lessee to contest any valuation. Lessee, on final determination of the proceeding or contest, shall immediately pay or discharge any decision or judgment rendered, together with all costs, charges, interest, and penalties incidental to the decision or judgment.

Lessor appoints Lessee as Lessor's exclusive agent for the purpose of obtaining information and other data from the county or city assessor, payment of taxes and instituting and maintaining any proceeding or contest allowed under this Section, with respect to all property taxes in connection with the Premises.

14. Default by Lessee: Remedies.

14.1 Defaults. The occurrence of any one or more of the following events shall constitute a material default and breach of this Lease by Lessee:

(a) The vacating or abandonment of the Premises by Lessee.

(b) The failure by Lessee to make any payment of rent or any other payment required to be made by Lessee hereunder, as and when due, where such failure shall continue for a period of one (1) week after the date Lessor gives Lessee written notice that the rent is past due.

Page 7 of 22

(c)     The failure by Lessee to timely observe or perform any of the terms, covenants, conditions or provisions of this Lease to be observed or performed by Lessee, other than described in paragraph (b) above, where such failure shall continue for a period of one (1) month after written notice thereof from Lessor to Lessee; provided, however, if the nature of the default is such that more than one (1) month is reasonably required for its cure, through no fault of Lessee, then Lessee shall not be deemed to be in default if Lessee commences such cure within said one (1) month period and thereafter diligently prosecutes such cure to completion within two (2) months following the date of Lessor's notice.

(d)     (i) The making by Lessee of any general assignment, or general arrangement for the benefit of creditors; (ii) the filing by or against Lessee of a petition to have Lessee adjudged bankrupt or a petition for reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Lessee, the same is dismissed within four (4) months); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within two (2) months or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within one (1) month.

    14.2    Remedies.  In the event of any such default or breach by Lessee, Lessor may at any time thereafter, with or without notice or demand and without limiting Lessor in the exercise of any other right or remedy which Lessor may have by reason of such default or breach:

(a)     Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession of the Premises to Lessor.  In such event Lessor shall be entitled to recover from Lessee all damages incurred by Lessor by reason of Lessee's default including, but not limited to, the cost of recovering possession of the Premises; expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorney's fees, and any real estate commission actually incurred; and the worth at the time of award by the court having jurisdiction thereof of the amount by which the unpaid rent for the balance of the term after the time of such award exceeds the amount of such rental loss for the same period that Lessee proves could be reasonably avoided.  Unpaid installments of rent or other moneys due Lessor under this Lease shall bear interest from the date due at the rate of twelve percent (12%) per annum.  In the event Lessee shall have abandoned the Premises, Lessor shall have the option of (i) retaking possession of the Premises and recovering from Lessee the amount specified in this Section 14.2(a), or (ii) proceeding under Section 14.2(b).

(b)     Maintain Lessee's right to possession in which case this Lease shall continue in effect whether or not Lessee shall have abandoned the Premises.  In such event

Page 8 of 22





Lessor shall be entitled to enforce all of Lessor's rights and remedies under this Lease, including the right to recover the rent as it becomes due hereunder.

(c)  Cure Lessee's default, in which case any costs incurred by Lessor in effecting a partial or complete cure shall be immediately due and payable by Lessee as additional rent, and shall bear interest until paid at the rate provided in Section 14.2(a), above.

(d)  Pursue any other remedy now or hereafter available to Lessor under the laws or judicial decisions of the State of Missouri.

14.3  <u>Cumulative Remedies</u>.  No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

14.4  <u>Rights of Assignees, Leasehold Mortgagees and Subtenants</u>.  If, prior to a default by Lessee, Lessee has given Lessor written notice identifying the name and address of an assignee, leasehold mortgagee or subtenant to whom Lessee has transferred any interest in the Premises and who must be notified in the event of any default by Lessee (the "Additional Notice Parties"), then each of the Additional Notice Parties shall have the same period of time from the date Lessor gives the Additional Notice Party notice of Lessee's default as is provided above for Lessee to cure the default within which to cure Lessee's default, and Lessor cannot exercise its remedies for Lessee's default until the cure period for Lessee and the Additional Notice Parties to cure the default has expired without the default having been cured.

15.  <u>Subletting and Assignment</u>.  Lessee, and its successors or assigns, shall not transfer, mortgage or assign this Lease, or any of Lessee's rights, obligations and interests hereunder, or sublet all or any portion of the Premises, without Lessor's written consent, which consent may be withheld for any reason.  Provided Lessee may assign its rights under this Lease once to a limited liability company owned entirely by Lessee and for which Lessee is the sole member and manager.  Provided further in no event shall any such transfer, mortgage, sublease or assignment release Lessee or its successors from liability for timely performance of Lessee's obligations under this Lease.

16.  <u>Rezoning, Plat and Subdivision</u>.  The parties acknowledge that the Premises are currently zoned G.  Lessee intends to construct improvements on the Premises.  Lessee shall not undertake any of the following actions set forth in this Section 16, without the prior written consent of Lessor, which may be withheld in Lessor's discretion:

(a)  Rezone the Premises to another zoning classification;

(b)  Plat or subdivide the property of which the Premises are a part into commercial lots; or

(c)  Enter into a subdivision agreement for the Premises.

Page 9 of 22

In carrying out any such development activities approved by Lessor, Lessee shall engage legal counsel who is satisfactory to Lessor, in Lessor's reasonable discretion, to handle the same. All activities and proceedings with respect to Lessee's development of the Premises shall be undertaken at the sole risk and expense of Lessee. Lessee and the legal counsel engaged by Lessee to assist in the development of the Premises shall keep Lessor contemporaneously advised of all facts and circumstances relating to such development activities which would materially affect Lessor's ownership or reversionary interests in the Premises.

17.  Construction on the Premises. Lessee shall be responsible for and will prepare, including without limitation thereto, all aspects of design and engineering for the improvements to be constructed on the Premises by Lessee. Lessor shall have the right to review and approve all drawings and plans for safety and compliance with the Legal Requirements, if Lessor desires, such approval not to be unreasonably withheld, and such approval not to be deemed a representation or warranty by Lessor that such drawings and plans are in fact safe or in compliance with the Legal Requirements. Additionally, if Lessor waives its right to review any such drawings and plans, Lessor shall not thereby incur any liability for any noncompliance of such drawings and plans with the Legal Requirements or for any unsafe condition arising out of work completed pursuant to such drawings and plans. Lessee shall be responsible for licensing, permitting/approvals, the submission of shop drawings, samples, tests, field dimensions, determination of labor requirements and ordering of materials, equipment and machinery as required for the construction. All construction shall be completed in compliance with all applicable Legal Requirements and ordinances as required under Section 8 above and in a safe manner. Lessee shall not permit any liens against the Premises. Notwithstanding the foregoing, Lessee shall have the right to contest, in good faith, any claims of liens against the Premises. Lessee shall hold Lessor harmless and indemnified against any loss or expense resulting from the contest of any such claims of lien and in any event shall cause such lien to be removed within one (1) year after, or within one (1) week after any action by a lien claimant to foreclose such lien, whichever occurs first. In connection with the construction by Lessee of any improvements on the Premises, Lessee shall within two (2) months after substantial completion of any such improvements, at Lessee's expense, pave any portion of the Premises which Lessee uses for vehicular traffic, parking or other operations where, in the reasonable judgment of Lessor, dust or erosion can or may occur.

18.  Builders Risk Insurance. During any period of construction by Lessee of improvements on the Premises, Lessee shall maintain or cause to be maintained in effect All Risk Builders Risk insurance, including coverage against the perils of fire and extended coverage and physical loss or damage including theft, vandalism, malicious mischief, collapse, false-work, non-permanent building and debris removal and demolition required by enforcement of any laws, statutes, or ordinances, in an amount not less than the full replacement value of the construction with deductible and co-insurance provisions as may be acceptable to Lessor after review of coverage. As to any insurable risks of loss or damage to the work not required to be insured hereunder, Lessee or any contractor of Lessee (a "Contractor") shall bear the same. Lessee or any Contractor shall be deemed to be a self-insurer as to the deductible or any co-insurance applicable to

Page 10 of 22

such insurance coverage and shall pay any deductible or co-insurance amount applicable in the event of such loss or damage.

19.    Estoppel Certificate.

(a)    Lessee shall at any time upon not less than ten (10) days prior written notice from Lessor execute, acknowledge and deliver to Lessor a statement in writing (i) certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect) and the date to which the rent and other charges are paid in advance, if any, and (ii) acknowledging that there are not, to Lessee's knowledge, any uncured defaults on the part of Lessor hereunder, or specifying such defaults if any are claimed. Any such statement may be conclusively relied upon by any prospective purchaser or encumbrancer of the Premises.

(b)    Lessee's failure to timely deliver such statement within such time shall be conclusive upon Lessee (1) that this Lease is in full force and effect, without modification except as may be represented by Lessor, (ii) that there are no uncured defaults in Lessor's performance, and (iii) that not more than one month's rent has been paid in advance.

(c)    If Lessor desires to finance or refinance the Premises, or any part thereof, Lessee hereby agrees to deliver to any lender designated by Lessor such financial statements of Lessee as may be reasonably required by such lender. Such statements shall include the past three years' financial statements of Lessee. All such financial statements shall be received by Lessor in confidence and shall be used only for the purposes herein set forth.

20.    Lessor to Maintain Free and Clear Title. On the Commencement Date of this Lease, and until the Lease terminates or expires, Lessor shall not hereafter mortgage or transfer title to the Premises in a manner which does not permit Lessee to construct improvements and use the Premises as contemplated herein, without Lessee's consent, which shall not be unreasonably delayed or withheld. Any such lien shall be subordinate to Lessee's interest in the Premises.

21.    Quiet Enjoyment. Lessor covenants, represents and warrants that: (i) Lessor has full right and power to execute and deliver this Lease; (ii) Lessor shall do no act to disrupt Lessee's peaceful and quiet enjoyment of the Premises during the entire term of the Lease, except for acts by Lessor pursuant to Section 14.2; and (iii) Lessor shall defend, at Lessor's expense, Lessee's possession of the Premises against the lawful claims of all persons arising from an act of Lessor, other than claims resulting from persons claiming under restrictions, easements, or covenants of record or known to Lessee on the date hereof.

Page 11 of 22

23.  **Binding Effect; Choice of Law.**  Subject to any provisions hereof, this Lease shall bind the parties, their personal representatives, successors and assigns.  This Lease shall be governed by the laws of the state in which the Premises are situated.

24.  **Notices.**  All notices under this Lease must be in writing and sent prepaid same day or next day private courier or by United States certified mail, return receipt requested, addressed as follows, except that any party may by written notice given as aforesaid change its address for subsequent notices to be given hereunder:

To Lessor:            ConAgra Poultry Company
                      c/o ConAgra Refrigerated Prepared Foods
                      2001 Butterfield Road
                      Downers Grove, IL 60615
                      Attn: Sr. V. P. Finance

With copy to:         ConAgra Foods, Inc.
                      One ConAgra Drive,
                      Omaha, Nebraska 68102
                      Attn: Vice President/Controller

To Lessee:            Renewable Environmental Solutions, L.L.C.
                      2001 Butterfield Road
                      Downers Grove, IL 60515
                      Attn:  President

24.  **Recording Memorandum of Lease.**  Lessee shall have the right to record a memorandum of this Lease in the form set forth on **Exhibit "C"** attached hereto and incorporated by reference herein.  If such memorandum must be recorded against the entire parcel of which the Premises form a part, then the parties agree to execute from time to time such other memoranda of this Lease as may be necessary to put the public on notice of this Lease while enabling Lessor to transfer or develop the balance of such parcel, unrestricted by this Lease.  Lessor agrees to execute a memorandum of Lease suitable for recording at the request of Lessee, and upon termination of the Lease Lessee agrees to record a release of such memorandum in a form reasonably acceptable to Lessor.

25.  **Subordination.**

(a)     This Lease, at Lessor's option, shall be subordinate to any ground lease, mortgage, deed of trust, or any other hypothecation for security now or hereafter placed upon the real property of which the Premises are a part and to any and all advances made on the security thereof and to all renewals, modifications, consolidations, replacements and extensions thereof.  Notwithstanding such subordination, Lessee's right to quiet possession of the Premises shall not be disturbed if Lessee is not in

Page 12 of 22

default and so long as Lessee shall pay the rent and observe and perform all of the provisions of this Lease, unless this Lease is otherwise terminated pursuant to its terms. If any mortgagee, trustee or ground lessor shall elect to have this Lease prior to the lien of its mortgage, deed of trust or ground lease, and shall give written notice thereof to Lessee, this Lease shall be deemed prior to such mortgage, deed of trust, or ground lease, whether this Lease is dated prior or subsequent to the date of said mortgage, deed of trust or ground lease or the date of recording thereof.

(b)     Lessee agrees to execute any documents required to effectuate such subordination or to make this Lease prior to the lien of any mortgage, deed of trust or ground lease, as the case may be, as long as such documents provide that Lessee's right to quiet possession of the Premises shall not be disturbed if Lessee is not in default of the provisions of the Lease, and failing to do so within ten (10) days after written demand, Lessee does hereby make, constitute and irrevocably appoint Lessor as Lessee's attorney in fact and in Lessee's name, place and stead, to do so.

26.     Representations and Warranties.

26.1    Lessor's Representations and Warranties. As an inducement to Lessee to enter into this Lease, Lessor represents and warrants to Lessee that:

(a)     Lessor is a corporation, duly organized and validly existing under the laws of the State of Delaware, has the power and authority to enter into this Lease and to consummate the transactions herein contemplated, and the execution and delivery hereof and the performance by Lessor of its obligations hereunder will not violate or constitute an event of default under the terms or provisions of any agreement, document or other instrument to which Lessor is a party or by which it or the Premises is bound;

(b)     The execution, delivery and performance of this Lease by Lessor and the consummation of the transaction contemplated hereby in the manner contemplated herein will not violate any provision of any laws, statutes, codes, ordinances, orders, regulations or requirements to which Lessor or the Premises is subject, or violate any judgment, order, writ, injunction or decree of any court applicable to Lessor or the Premises; and

(c)     This Lease is the legal, valid and binding obligation of Lessor, enforceable in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally.

26.2    Limitation on Lessor's Representations, Warranties, Covenants and Agreements. Lessee acknowledges and agrees that, except as expressly set forth in this Lease, neither Lessor, nor any agent or representative of Lessor has made, and Lessor is not liable or responsible for or bound

Page 13 of 22

in any manner by, any express or implied representations, warranties, covenants, agreements, obligations, guarantees, statements, information or inducements pertaining to the Premises or any part thereof, title to the Premises, the physical condition thereof, the fitness and quality thereof, the value and profitability thereof, or any other matter or thing whatsoever with respect thereto. Lessee acknowledges, agrees, represents and warrants that it has had such access to the Premises and such other matters and to information and data relating to all of same as Lessee has considered necessary, prudent, appropriate or desirable for the purposes of this transaction and, without limiting the foregoing, that Lessee and its agents and representatives have independently inspected, examined, investigated, analyzed and appraised all of same.  Without limiting the foregoing, Lessee acknowledges and agrees that, except as expressly set forth in this Lease, neither Lessor nor any director, officer, employee, agent or representative of Lessor is liable or responsible for or bound in any manner by (and Lessee has not relied upon) any oral or written or supplied representations, warranties, covenants, agreements, obligations, guarantees, statements, information or inducements pertaining to the Premises or any part thereof, and any other information respecting same furnished by or obtained from Lessor or any agent or representative of Lessor.  Lessee acknowledges and agrees that, except as otherwise provided in this Lease, Lessee is leasing the Premises, "AS IS".

26.3    Survival of Lessor's Representations and Warranties.  The representations and warranties contained in Section 26.1 are true, accurate and complete and not misleading in any material respect as of the Commencement Date.  The representations and warranties in Section 26.1 shall survive the Commencement Date.

26.4    Lessee's Representations and Warranties.  As an inducement to Lessor to enter into this Lease, Lessee represents and warrants that:

(a)    Lessee is a limited liability company duly organized and validly existing under the laws of the State of Delaware, and has the power and authority to enter into this Lease and to consummate the transactions herein contemplated, and the execution and delivery hereof and the performance by Lessee of its obligations hereunder will not violate or constitute an event of default under the terms or provisions of any agreement, document or other instrument to which Lessee is a party or by which it is bound;

(b)    the execution, delivery and performance of this Lease by Lessee and the consummation of the transactions contemplated hereby in the manner contemplated herein will not violate any provisions of any legal requirement to which Lessee is subject, or violate any judgment, order, writ, injunction or decree of any court applicable to Lessee;

(c)    this Lease is the legal, valid and binding obligation of Lessee, enforceable in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally; and

Page 14 of 22

(d)     no consent, authorization, license, permit, registration or approval of, or exemption or other action by any governmental or public body, commission or authority is required in connection with the execution and delivery by Lessee of this Lease.

26.5    Survival of Lessee's Representations and Warranties.  The representations and warranties contained in Section 26.4 are true, accurate and complete and not misleading in any material respect as of the Commencement Date.  The representations and warranties in Section 26.4 shall survive the Commencement Date.

27.     Brokerage Commission and Finder's Fee.  The parties agree that they have dealt with each other and not through any real estate broker, investment banker, person, firm or entity who would, by reason of such dealings, be able to claim a real estate brokerage, business opportunity brokerage or finder's fee as the procuring cause of this transaction.  Each of the parties agrees to indemnify the other and hold the other harmless of and from any and all loss, cost, damage, injury or expense arising out of, or in any way related to, assertions, by any other person, firm or entity, of a claim to real estate brokerage, business opportunity brokerage or finder's fee based on alleged contacts between the claiming party and the indemnifying party which have resulted in allegedly providing a broker or finder with the right to claim such commission or finder's fee.  The provisions of this Section 27 shall survive the termination of this Lease.

28.     Leasehold Mortgages.  At any time and from time to time during the Term, Lessee, its assignees, transferees or subtenants may mortgage hypothecate, pledge, assign, and encumber their interest in the Premises, the improvements thereon and in this Lease by way of any documentation, including, but not limited to mortgages, leasehold mortgages, assignments, deeds of trust, and security agreements, financing statements, and other encumbrances (all hereinafter referred to as "Leasehold Mortgages"), containing such terms, covenants, conditions and provisions as Lessee, its assignees, transferees, and subtenants shall, in their sole discretion, agree to, provided all such Leasehold Mortgages shall be junior and subordinate to this Lease.

29.     Bankruptcy.  If Lessor or any trustee of Lessor shall reject this Lease pursuant to Section 365(h) of the Bankruptcy Code, 11 U.S.C §365(h), or, to the extent applicable, any successor or substitute provision in the Bankruptcy Code, or any successor or substitute code ("Section 365(h)"), then (a) Lessee shall without further act or deed whatsoever be deemed to have elected under Section 365(h) to remain in possession of the Premises for the balance of the term of this Lease, including all renewals and extensions thereof, (b) any exercise or attempted exercise by Lessee of a right to treat this lease as terminated under Section 365(h) of the Bankruptcy Code shall be void, (c) the laws of the State of Missouri shall continue to govern the interpretation and enforcement of the Lease terms (unless the Bankruptcy Code otherwise expressly requires), and (d) each Leasehold Mortgage encumbering the Premises shall without any further act or deed whatsoever continue in force as to the continuing possessory rights of Lessee, and shall constitute a lien against, and an absolute and unconditional assignment of, any future claim or cause of action Lessee may have against Lessor for damages, with the same relative priority as existed with respect to the leasehold estate prior to such rejection.

Page 15 of 22

30. **Counterparts.** This Lease may be executed and delivered in one or more counterparts, each of which when fully executed and delivered shall constitute an original, fully enforceable agreement.

31. **Successors and Assigns.** The terms, covenants and conditions herein shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto permitted herein and shall run with the land.

32. **Lessor's Access.** Lessor and Lessor's agents shall have the right to enter the Premises at reasonable times and, when practicable, upon reasonable advance notice to Lessee for the purposes of inspecting the same, showing the same to prospective purchasers, or lenders, and making such alterations, repairs, or improvements to the Premises or to the building of which they are a part as Lessor may deem necessary or desirable to the extent necessary to perform the obligations of Lessee hereunder. Provided, if Lessee is not in default, then Lessor's right to show the interior of the building on the Premises to third parties shall be subject to Lessee's right to require reasonable protection from the disclosure to any person of Lessee's confidential, proprietary information. Lessor may at any time place on or about the Premises any ordinary "For Sale" signs and Lessor may at any time during the last four (4) months of the term hereof place on or about the Premises any ordinary "For Lease" signs, all without rebate or reduction of rent or liability to Lessee.

IN WITNESS WHEREOF, the parties have executed this Lease as of the date first written above.

ConAgra Poultry Company, a Delaware corporation, Lessor

By: _____

Its: _V. P. CONTROLLER_

Renewable Environmental Solutions, LLC, a Delaware limited liability company, Lessee

By: _____

Its: _____

STATE OF _ILLINOIS_ )
                                  ) ss.
COUNTY OF _DuPage_ )

On this _3RD_ day of _APRIL_, 2002, before me a Notary Public in and for said county and state, personally appeared _A. V. FISHA_ as _V. P. CONTROLLER_

Page 16 of 22

of ConAgra Poultry Company, a Delaware corporation, known to me to be the identical person who subscribed their name to the foregoing, and acknowledged the execution thereof to be their voluntary act and deed and the voluntary act and deed of said corporation.

OFFICIAL SEAL
LOIS S FOCKLER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 07/09/04

Notary Public
My Commission Expires: 07/09/04

STATE OF ILLINOIS )
) ss.
COUNTY OF DuPAGE )

On this 3rd day of APRIL, 2002, before me a Notary Public in and for said county and state, personally appeared P.J. SAMSON as PRESIDENT of Renewable Environmental Solutions, LLC , a Delaware limited liability company, known to me to be the identical person who subscribed their name to the foregoing, and acknowledged the execution thereof to be their voluntary act and deed and the voluntary act and deed of said corporation.

OFFICIAL SEAL
LOIS S FOCKLER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 07/09/04

Notary Public
My Commission Expires: 07/09/04

Page 17 of 22

### Exhibit "A"

Legal Description of Premises

### PROPOSED LEASE AREA BOUNDARY DESCRIPTION

A TRACT OF LAND LOCATED IN THE SOUTHWEST QUARTER OF SECTION 34, TOWNSHIP 29 NORTH, RANGE 31 WEST, AND IN "NORTH CARTHAGE", A RECORDED SUBDIVISION IN JASPER COUNTY, MISSOURI, IN THE CITY OF CARTHAGE, JASPER COUNTY, MISSOURI, MORE PARTICULARLY DESCRIBES AS FOLLOWS:
COMMENCING AT THE SOUTHWEST CORNER OF LOT 601 IN "NORTH CARTHAGE" IN SAID SOUTHWEST QUARTER;
THENCE, NORTH 00°28'09" WEST, ALONG THE EAST RIGHT-OF-WAY LINE OF "MAIN STREET", 855.33 FEET;
THENCE, NORTH 90°00'00" EAST, 617.76 FEET;
THENCE, SOUTH 71°50'12" EAST, 223.29 FEET, TO THE POINT OF BEGINNING;
THENCE, NORTH 00°00'00" EAST, 77.73 FEET;
THENCE, NORTH 90°00'00" EAST, 410.04 FEET;
THENCE, SOUTH 00°28'09" EAST, 25.80 FEET;
THENCE, NORTH 89°31'51" EAST, 27.41 FEET;
THENCE, SOUTH 00°00'00" WEST, 254.84 FEET;
THENCE, NORTH 90°00'00" WEST, 437.56 FEET;
THENCE, NORTH 00°00'00" EAST, 202.70 FEET, TO THE POINT OF BEGINNING.
CONTAINING 2.80 ACRES, MORE OR LESS.

### Exhibit "B"

Legal Description of Access Road

Legal Description of Easement Area

INGRESS/EGRESS EASEMENT

A STRIP OF LAND 50 FEET WIDE LYING 25 FEET ON EITHER SIDE OF THE
FOLLOWING DESCRIBED CENTERLINE, IN THE SOUTHEAST QUARTER OF
SECTION 33 AND IN THE SOUTHWEST QUARTER OF SECTION 34, ALL IN
TOWNSHIP 29 NORTH, RANGE 31 WEST, AND IN "NORTH CARTHAGE", A
RECORDED SUBDIVISION IN JASPER COUNTY, MISSOURI, IN THE CITY OF
CARTHAGE, JASPER COUNTY, MISSOURI; COMMENCING AT THE SOUTHWEST
CORNER OF LOT 601 IN SAID "NORTH CARTHAGE"; THENCE, NORTH 00°28'09"
WEST, ALONG THE EAST RIGHT-OF-WAY LINE OF "MAIN STREET", 853.33 FEET,
TO THE POINT OF BEGINNING OF SAID CENTERLINE; THENCE, NORTH 90°00'00
EAST, 617.76 FEET, ALONG SAID CENTERLINE; THENCE, SOUTH 71°50'12" EAST,
223.29 FEET, FOR A TERMINUS OF SAID CENTERLINE. CONTAINING 0.89 ACRES,
MORE OR LESS.

## Exhibit "C"

### Memorandum of Lease

MEMORANDUM, dated for reference purposes only, _____, 2002, (the "Effective Date"), is made by and between **CONAGRA POULTRY COMPANY**, a Delaware corporation ("Lessor") and **RENEWABLE ENVIRONMENTAL SOLUTIONS, LLC**, a Delaware limited liability company ("Lessee"). Lessor has leased to Lessee, by a written Ground Lease Agreement dated the same date as the Effective Date, (the "Lease"), the Premises described below, on the following basic terms:

1. **Premises.** The real estate, and any buildings and improvements thereon, legally described on **Exhibit "A"** attached hereto, (the "Premises"), together with non-exclusive right of ingress and egress to and from the Premises and Main Street over the property described in **Exhibit "B"** attached hereto.

2. **Term.** The term of the Lease is for twenty-five (25) years after the Effective Date. Lessee has an option to renew the term of the Lease for five (5) additional terms of five (5) years each.

3. **Addresses.** The addresses of the parties are:

To Lessor:
ConAgra Poultry Company
c/o ConAgra Refrigerated Prepared Foods
2001 Butterfield Road
Downers Grove, IL 60615
Attn: Sr. V. P. Finance

With copy to:
ConAgra Foods, Inc.
One ConAgra Drive
Omaha, Nebraska 68102
Attn: Vice President/Controller

To Lessee:
Renewable Environmental Solutions, L.L.C.
2001 Butterfield Road
Downers Grove, IL 60515
Attn: President

4. **Purpose of Memorandum.** This Memorandum is prepared for the purpose of recordation, and it in no way modifies or amends the Lease.

Executed as of the Effective Date.

ConAgra Poultry Company, a Delaware corporation, Lessor

By: _____
Its: _____

Renewable Environmental Solutions, LLC, a Delaware limited liability company, Lessee

By: _____
Its: _____

STATE OF _____ )
                       ) ss.
COUNTY OF _____ )

On this ____ day of _____, 2002, before me a Notary Public in and for said county and state, personally appeared _____ as _____ of ConAgra Poultry Company, a Delaware corporation, known to me to be the identical person who subscribed their name to the foregoing, and acknowledged the execution thereof to be their voluntary act and deed and the voluntary act and deed of said corporation.

_____
Notary Public
My Commission Expires:

STATE OF _____ )
                       ) ss.
COUNTY OF _____ )

On this ____ day of _____, 2002, before me a Notary Public in and for said county and state, personally appeared _____ as _____ of Renewable Environmental Solutions, LLC , a Delaware limited liability company, known to me to be the identical person who subscribed their name to the foregoing, and acknowledged the execution thereof to be their voluntary act and deed and the voluntary act and deed of said company.

_____
Notary Public

My Commission Expires: _____



## GUARANTY

FOR VALUE RECEIVED, and in consideration for, and as an inducement to ConAgra Foods, Inc., a Delaware corporation ("ConAgra") to enter into that certain Securities Exchange Agreement by and between ConAgra and Changing World Technologies, Inc., a Delaware corporation ("Guarantor") (the "Agreement"), Guarantor hereby guarantees to ConAgra the full and timely payment, performance, discharge and observance by Renewable Environmental Solutions, LLC ("RES") of all the terms, covenants and agreements contained in (i) the By-Products Supply Agreement, dated May 10, 2005, between ConAgra Foods Packaged Foods Company, Inc. ("CFPFC") and RES (the "By-Products Agreement"), and (ii) the Ground Lease, dated April 3, 2002, between CFPFC and RES (the "Ground Lease" and, together with the By-Products Agreement, the "RES Agreements") to be performed and observed by RES, for which the Guarantor shall be jointly and severally liable with RES. The Guarantor further covenants and agrees that the Guarantor will be bound by all the provisions, terms, conditions, restrictions and limitations contained in the RES Agreements, the same as though the Guarantor were a party thereto in the place of RES. Guarantor agrees that ConAgra may proceed against Guarantor separately or jointly before, after or simultaneously with proceeding against RES.

Guarantor hereby waives notice of any default, nonpayment, partial payment, presentment, demand, protest or notice of protest and all other notices to which Guarantor might otherwise be entitled. Guarantor further expressly waives any and all defenses, claims, setoffs and discharges of RES pertaining to its obligations under the RES Agreements, except the defense of discharge by payment in full.

The liability of Guarantor shall not be affected or impaired by any voluntary or involuntary liquidation, dissolution, sale or disposition of all or substantially all of the assets, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization or other similar events or proceedings affecting RES or any of its assets. Guarantor will not assert against ConAgra any claim, defense or setoff available to Guarantor against RES.

Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all of the provisions should nevertheless remain in effect. This Guaranty contains all agreements of the parties with respect to any matter mentioned herein. No prior guaranty or understanding pertaining to any such matter shall be binding or effective on either party. This Guaranty may be modified only in writing signed by all parties in interest.

All obligations and liabilities of the Guarantor pursuant to this Guaranty shall be binding upon the successors and assigns of the Guarantor. This Guaranty shall be governed by and construed in accordance with the laws of the State of Delaware.

DATED: July *15*, 2005.

CHANGING WORLD TECHNOLOGIES, INC.,
a Delaware corporation (Guarantor)

By: _____

Its: _____

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") made _____October 14_____, 2003, by and between ConAgra Poultry Company, a Delaware corporation (hereinafter referred to as "ASSIGNOR"), and ConAgra Foods Refrigerated Foods Co., Inc., a Delaware corporation (hereinafter referred to as "ASSIGNEE").

### WITNESSETH:

In consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the parties agree as follows:

1. <u>Assignment.</u> ASSIGNOR, for itself and its successors and assigns, does hereby assign and transfer unto ASSIGNEE, its successors and assigns, all of ASSIGNOR'S right, title and interest in and to that certain Ground Lease Agreement between ASSIGNOR and Renewable Environmental Solutions, LLC, a Delaware limited liability company dated as of April 3, 2002, a copy of which is attached hereto as <u>Exhibit A</u> and incorporated herein by this reference (the "Lease").

2. <u>Assumption.</u> ASSIGNEE, for itself and its successors and assigns, does hereby accept, assume, take over, and succeed to all of ASSIGNOR'S right, title and interest in and to the Lease and all its terms, conditions, provisions, covenants and obligations contained therein, which ASSIGNOR is obligated to keep or perform whether accrued before or after the Effective Time, and hereby covenants with ASSIGNOR, its successors and assigns, to fully and faithfully make, keep and perform all payments, terms, conditions, covenants and obligations contained in the Lease, to be made, kept or performed by ASSIGNOR.

3. <u>Effective Time of Assignment.</u> The assignment and assumption in this Agreement shall take effect as of the date of, but immediately prior to, the sale of the shares of ASSIGNOR to Pilgrim's Pride Corporation (the "Effective Time").

4. <u>Further Assurances.</u> ASSIGNOR and ASSIGNEE shall, after the Effective Time, take such additional actions as may be reasonably necessary to accomplish the assignment and assumption of the Lease.

IN WITNESS WHEREOF, ASSIGNOR and ASSIGNEE have caused this Agreement to be executed by their proper officers, hereunto duly authorized, the day and year first written above.

CONAGRA POULTRY COMPANY,
a Delaware corporation

By: _Scott E Messel_

Its: __VICE PRESIDENT, TREASURER__

CONAGRA FOODS REFRIGERATED
FOODS CO., INC., a Delaware corporation

By: _____

Its: _VICE PRESIDENT_

ASSIGN EX SUBL 0402
CARTHAGE 411 N RENEWABLE

- 1 -

## ASSIGNMENT AND ASSUMPTION AGREEMENT - WHITE MEAT

**AGREEMENT**, dated this 2ND day of October, 2006, by and between **CONAGRA FOODS PACKAGED FOODS COMPANY, INC.**, a Delaware corporation ("Seller"), and the other entities listed on the signature pages hereto (collectively, the "Assignors"), and **BUTTERBALL, LLC**, a North Carolina limited liability company ("Assignee").

## RECITALS:

This Agreement is made with reference to the following facts and objectives:

(a)     Seller and Smithfield Foods, Inc., a Virginia corporation ("Buyer"), have entered into an Asset Purchase Agreement, dated July 31, 2006, as amended (the "Purchase Agreement"), pursuant to which Seller agreed to sell to Buyer, and Buyer agreed to purchase from Seller, the Assets and assume from Seller the Contracts.

(b)     Buyer assigned its right to acquire certain of the Assets related to the growing and processing of turkey and sale and distribution of turkey products under the Butterball and Longmont brands (the "Turkey Business") to Assignee with Seller's consent pursuant to a Partial Assignment and Assumption Agreement, dated of even date herewith, by and between Assignee and Buyer (the "Partial Assignment").

(c)     Pursuant to the Purchase Agreement, as assigned by Buyer, Seller agreed to assign to Assignee those Contracts set forth on <u>Exhibit A</u> hereto (the "Designated Contracts") and those Assumed Liabilities set forth on <u>Exhibit B</u> hereto (the "Designated Liabilities"), and Assignee has agreed to assume such Designated Contracts and Designated Liabilities, all on the terms and conditions set forth in the Purchase Agreement.

(d)     All capitalized terms used without definition herein shall have the meaning specified in the Purchase Agreement.

## AGREEMENT:

In consideration of the foregoing recitals which are incorporated herein and are made a contractual part of this Agreement, and in consideration of the mutual agreements, provisions and covenants herein contained, the parties hereby agree as follows:

1.     **Effective Time of Assignment and Assumption**.  The assignment and assumption in this Agreement shall take effect as of the Effective Time.

2.     **Assignment and Assumption**.  Seller, and Assignors to the extent any are a party to the Designated Contracts, hereby assigns, transfers, conveys and delivers to Assignee, and Assignee hereby accepts and assumes the Designated Contracts and accepts, assumes and agrees to pay, perform and discharge when due the Designated Liabilities.

3.     **Counterparts**.  This Agreement may be executed in any number of counterparts (including faxed versions), each of which when executed shall be an original,  but all of the counterparts shall constitute one and the same instrument.

1

4.    **Governing Law**.  This Agreement shall be governed and construed in accordance with the laws of the State of Delaware.

The foregoing are being assigned by Seller and Assignors, as the case may be, and are being assumed by Assignee, in accordance with the terms of the Purchase Agreement, and all representations, warranties, covenants, indemnities and other terms and conditions contained in the Purchase Agreement are incorporated herein by reference and made a part of this Agreement as related to the liabilities and obligations assigned pursuant to this Agreement. Nothing herein relieves Buyer of its obligations under the Purchase Agreement, and nothing herein affects or alters any of Seller's rights or obligations pursuant to the Purchase Agreement. To the extent there is any conflict between this Agreement and the Purchase Agreement, the Purchase Agreement will control.

[Signatures on Following Page.]

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Assumption Agreement to be executed on the date first above written.

SELLER:

CONAGRA FOODS PACKAGED FOODS COMPANY, INC., a Delaware corporation

By: _____
Its: _____

ASSIGNORS:

CONAGRA FOODS, INC., a Delaware corporation

By: _____
Its: _____

CONAGRA BRANDS, INC., a Delaware corporation

By: _____
Its: _____

CONAGRA FOODS CANADA, INC., a Delaware corporation

By: _____
Its: _____

CONAGRA PANAMA, INC., a Delaware corporation

By: _____
Its: _____

CONAGRA SHARED PURCHASING, INC., a Delaware corporation

By: _____
Its: _____

CONAGRA TRADE GROUP, INC., a Delaware corporation

By: _____
Its: _____

ASSIGNEE:

BUTTERBALL, LLC, a North Carolina limited liability company

By: _Edward Kaczanto_
Its: _CEO_

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Assumption Agreement to be executed on the date first above written.

SELLER:

**CONAGRA FOODS PACKAGED FOODS COMPANY, INC., a Delaware corporation**

By: _____

Its: _____

ASSIGNORS:

**CONAGRA FOODS, INC., a Delaware corporation**

By: _____

Its: _____

**CONAGRA BRANDS, INC., a Delaware corporation**

By: _____

Its: _____

**CONAGRA FOODS CANADA, INC., a Delaware corporation**

By: _____

Its: _____

**CONAGRA PANAMA, INC., a Delaware corporation**

By: _____

Its: _____

**CONAGRA SHARED PURCHASING, INC., a Delaware corporation**

By: _____

Its: _____

**CONAGRA TRADE GROUP, INC., a Delaware corporation**

By: _____

Its: _____

ASSIGNEE:

**BUTTERBALL, LLC, a North Carolina limited liability company**

By: _____

Its: _____

## Exhibit "A"

### Designated Contracts

1. Lease of Property dated September 17, 2003 between Union Pacific Railroad Company and ConAgra Foods Refrigerated Foods Co., Inc. for land on which the Alix, AR feed mill is located.

2. Lease Agreement dated January 3, 1990 between Union Pacific Railroad Company and ConAgra, Inc. for land on which the Platteville, CO feed mill is located.

3. Lease Agreement (P&A Turkey Farm) dated October 23, 1987, as amended on May 27, 1988, between P&A Turkey, Inc. and ConAgra Foods Refrigerated Foods Co., Inc. (as assignee of ConAgra Poultry Company) for the following Leased Longmont Turkey Farms: P&A Turkey Farm-Greeley and P&A Turkey Farm-Kersey.

4. Lease Agreement (P-K Farm) dated October 23, 1987, as amended on May 27, 1988, between P-K Farms Company and ConAgra Foods Refrigerated Foods Co., Inc. (as assignee of ConAgra Poultry Company) for the following Leased Longmont Turkey Farms: P-K Turkey Farm.

5. Lease Agreement (Pluss Turkey Farm) dated October 23, 1987, as amended on May 27, 1988, between Pluss Turkey and ConAgra Foods Refrigerated Foods Co., Inc. (as assignee of ConAgra Poultry Company) for the following Leased Longmont Turkey Farms: Pluss Turkey Farm East and Pluss Turkey Farm West.

6. Lease Agreement (Sandy Hills Farm) dated October 23, 1987, as amended on May 27, 1988, between Sandy Hills, Inc. and ConAgra Foods Refrigerated Foods Co., Inc. (as assignee of ConAgra Poultry Company) for the following Leased Longmont Turkey Farms: Sandy Hills Farms.

7. Lease Agreement (Strear Farms) dated October 23, 1987, as amended on May 27, 1988, between Strear Farms, Inc. and ConAgra Foods Refrigerated Foods Co., Inc. (as assignee of ConAgra Poultry Company) for the following Leased Longmont Turkey Farms: Longmont Gordon Turkey Farm No. 1, Gordon Turkey Farm No. 2, Premium Turkey Farm, SLS Turkey Farm, Strear Farms Farm and K&S Turkey Farm. Includes Termination Agreement dated August 24, 2005 between Strear Farms Company and ConAgra Foods Packaged Foods Company, Inc. with respect to Mountain View Turkey Farm.

8. Not Applicable.

9. Not Applicable.

10. Lease and Service Agreement dated January 6, 1989 between ConAgra Foods Refrigerated Foods Co., Inc. and City of Carthage, Missouri for the Carthage, Missouri pretreatment facility site and pretreatment facility.

11. Lease Agreement, undated, between Americold Logistics, LLC and ConAgra Foods Packaged Foods Company, Inc. for space in the Americold Logistics, LLC Carthage, Missouri warehouse facility.

12. Lease Agreement dated September 12, 1996 between Cargill Incorporated and the City of Ozark, Arkansas.

13. Not Applicable.

14. Not Applicable.

15. Not Applicable.

16. Not Applicable.

17. Not Applicable.

18. Not Applicable.

US2000 9490672.3

19.    Not Applicable.

20.    Not Applicable.

21.    Not Applicable.

22.    Not Applicable.

23.    Not Applicable.

24.    Not Applicable.

25.    Agreement by and between ConAgra Foods Refrigerated Foods Co., Inc. (Carthage Missouri) and General Drivers & Helpers affiliated with the International Brotherhood of Teamsters Local Union No. 823, effective April 13, 2006 until April 12, 2009; including Confirmation of Agreement dated March 28, 2003; and including Letter of Intent.

26.    Agreement between ConAgra Foods Refrigerated Foods Co., Inc. (Carthage, Missouri) and United Food and Commercial Workers International Union AFL-CIO/CLC, District Union Local Two, effective April 26, 2004 through May 4, 2008.

27.    Not Applicable.

28.    Not Applicable.

29.    Not Applicable.

30.    Not Applicable.

31.    Not Applicable.

32.    Not Applicable.

33.    Agreement between Longmont Foods (Longmont, Colorado) and United Food and Commercial Workers International Union, AFL-CIO, CLC Local 990 and International Union of Operating Engineers Local No. 1, effective February 3, 2002 through February 5, 2005; including Letter of Extension dated February 24, 2005. Memorandum of Agreement dated May 23, 2006 between ConAgra Foods and United Food and Commercial Workers Union Local No. 7.; and including Proposed Agreement between the parties for February 2005 through February 2008.

34.    Agreement between ConAgra Foods (Longmont, Colorado) and International Union of Operating Engineers Local No. 1, AFL-CIO (successor to IUOE Local 7), effective February 5, 2005 through February 7, 2009.

35.    Not Applicable.

36.    Not Applicable.

37.    Not Applicable.

38.    Not Applicable.

39.    Agreement by and between ConAgra Foods Refrigerated Foods Co., Inc., and its Sherwin, Kansas Feed Mill and Bakery, Confectionery, Tobacco Workers and Grain Millers International Union, Local No. 51 G AFL-CIO. CLC, effective January 26, 2003 through January 27, 2006; and, a Letter of Extension and Retroactivity dated January 27, 2006.

40.    Not Applicable.

41.    Consulting Agreement dated July 5, 2006 between ConAgra Foodservice Company and Roger W. Seaman.

42.    Not Applicable.

43.    Not Applicable.

44. Columbus-Sherwin, Kansas - Ad Valorem Tax Exemption - Order of Board of Tax Appeals of State of Kansas, dated September 2, 1998, & Corrected Order of Board of Tax Appeals of State of Kansas, dated September 24, 1998 (Docket No. 1997-10138- EDX); Cherokee County Statement of Policies and Procedures for Tax Exemptions and Incentives for Economic Development (and adopting resolution), dated January 1, 1996.

45. Not Applicable.

46. Not Applicable.

47. Not Applicable.

48. Not Applicable.

49. Not Applicable.

50. Not Applicable.

51. Not Applicable.

52. Not Applicable.

53. Not Applicable.

54. Not Applicable.

55. Not Applicable.

56. Not Applicable.

57. Trademark License Agreement dated May 31, 2004 between ConAgra Foods Canada, Inc. and Parrish & Heimbecker, Limited.

58. License Agreement dated December 1, 1969 between Leo Peters and Swift & Company.

59. Trademark License dated November 30, 1987 between Swift-Eckrich, Inc. and Butterball Foods Limited.

60. Not Applicable.

61. Not Applicable.

62. Not Applicable.

63. Not Applicable.

64. Not Applicable.

65. Not Applicable.

66. Not Applicable.

67. Not Applicable.

68. Not Applicable.

69. Not Applicable.

70. Not Applicable.

71. Not Applicable.

72. Not Applicable.

73. Not Applicable.

74. Not Applicable.

75. Not Applicable.

| | |
|---|---|
| 76. | Not Applicable. |
| 77. | Not Applicable. |
| 78. | Not Applicable. |
| 79. | Not Applicable. |
| 80. | Not Applicable. |
| 81. | Not Applicable. |
| 82. | Not Applicable. |
| 83. | Not Applicable. |
| 84. | Not Applicable. |
| 85. | Not Applicable. |
| 86. | Not Applicable. |
| 87. | Not Applicable. |
| 88. | Not Applicable. |
| 89. | Not Applicable. |
| 90. | Not Applicable. |
| 91. | Not Applicable. |
| 92. | Not Applicable. |
| 93. | Not Applicable. |
| 94. | Not Applicable. |
| 95. | Not Applicable. |
| 96. | Not Applicable. |
| 97. | Not Applicable. |
| 98. | Supply Agreement dated December 1, 2004 between ConAgra Foods Packaged Foods Company, Inc. and S.C. Johnson & Son, Inc. |
| 99. | Not Applicable. |
| 100. | Not Applicable. |
| 101. | Sales Contract dated February 1, 2006 between ConAgra Foods Refrigerated Foods Company, Inc. and Novus International, Inc. |
| 102. | Sales Contract dated January 1, 2006 between ConAgra Foods and BASF Corp. |
| 103. | Sales Contract dated May 1, 2006 between ConAgra Foods, Inc. and Chinook Global Limited. |
| 104. | Sales Agreement dated January 1, 2006 between ConAgra Foods, Inc. and PCS Sales (USA), Inc. |
| 105. | Sales Contract dated June 30, 2005 between ConAgra Foods and Ajinomoto Heartland LLC. |
| 106. | Not Applicable. |
| 107. | Not Applicable. |
| 108. | Not Applicable. |
| 109. | Verbal Agreement with Degussa for Supply of Methionine. |
| 110. | Not Applicable. |

111. Not Applicable.

112. Not Applicable.

113. Not Applicable.

114. Not Applicable.

115. The rights and obligations with respect to the Business under Sales Agreement dated November 8, 2005 between ConAgra Foods, Inc. and Wayne Farms, LLC.

116. Not Applicable.

117. Not Applicable.

118. Turkey Hauling Agreement dated March 8, 2006 between ConAgra Foods Packaged Foods Company, Inc. and Lew Thompson & Sons, Inc.

119. Turkey Hangers Agreement dated March 11, 2005 between ConAgra Foods Packaged Foods Company, Inc. and Smith Turkey Hangers, as amended on March 6, 2006.

120. Equipment Lease Agreement dated May 25, 2004 between ConAgra Refrigerated Foods and AAA Business Systems, Inc.

121. Shuttle Delivery Agreement dated September 4, 2005 between ConAgra Foods Packaged Foods Company, Inc. and Lew Thompson & Sons, Inc., including Proposed Amendment.

122. Agreement dated July 30, 2004 between ConAgra Foods Refrigerated Foods Company, Inc. (d/b/a Butterball Turkey Company) and Simmons Foods, Inc.

123. Services Agreement dated January 12, 2005 between ConAgra Foods Packaged Foods Company, Inc. and Packer's Sanitation Services, Inc.

124. Services Agreement dated April 28, 2006 between ConAgra Foods Packaged Foods Company, Inc. and Terra Renewal Services, Inc.

125. Equipment Lease dated March 29, 2006 between ConAgra Foods Packaged Foods Company, Inc. and Excel Dehumidification Engineering Services, LLC.

126. Services Agreement dated January 3, 2005 between ConAgra Foods Packaged Foods Company, Inc. and BMS Contract Services, as amended on January 4, 2006 and May 1, 2006.

127. Pest Management Service Agreement dated January 1, 2006 between ConAgra Foods, Inc. and Industrial Fumigent Company.

128. Vending Service Agreement dated December 10, 2004 between ConAgra Foods and C.L. Swanson Corp.

129. Transportation Agreement dated September 19, 2004 between ConAgra Foods Refrigerated Foods Company, Inc. (d/b/a Butterball Turkey Company) and Penske Logistics LLC.

130. Oxxium Loan Agreement dated October 9, 2003 between ConAgra Foods Refrigerated Foods Company, Inc. and Ecolab, Inc.

131. Turkey Rendering Agreement dated March 13, 2006 between ConAgra Foods Packaged Foods Company, Inc. and Pilgrim's Pride Corp.

132. Services Agreement dated June 30, 2005 between ConAgra Foods Packaged Foods Company, Inc. and Packer's Sanitation Services, Inc.

133. Agreement dated September 30, 1997 between Penske Logistics, Inc. and Cargill Incorporated.

134. Rental Agreement dated May 18, 2004 between ConAgra Foods and Konica Minolta Business Solutions U.S.A., Inc.

135. Not Applicable.

| 136. | Not Applicable. |
|---|---|
| 137. | Not Applicable. |
| 138. | Not Applicable. |
| 139. | Not Applicable. |
| 140. | Not Applicable. |
| 141. | Not Applicable. |
| 142. | Not Applicable. |
| 143. | Not Applicable. |
| 144. | Not Applicable. |
| 145. | Feed Supply Agreement dated January 5, 2004 between ConAgra Refrigerated Foods Company, Inc. and Ag Forte, LLC. |
| 146. | Agreement dated January 24, 1996 between the South East Kansas Railroad and ConAgra Poultry Company, a division of ConAgra Inc. |
| 147. | Not Applicable. |
| 148. | Not Applicable. |
| 149. | Not Applicable. |
| 150. | Not Applicable. |
| 151. | Not Applicable. |
| 152. | Not Applicable. |
| 153. | Not Applicable. |
| 154. | Image Management Agreement dated September 25, 2002 between ConAgra Poultry Company and 10S Capital, as amended on January 31, 2003. |
| 155. | Service Agreement dated February 21, 2006 between ConAgra Foods Packaged Foods Company, Inc. and BMS Contract Services. |
| 156. | Not Applicable. |
| 157. | Not Applicable. |
| 158. | Not Applicable. |
| 159. | Not Applicable. |
| 160. | Not Applicable. |
| 161. | [Reserved.] |
| 162. | By-Products Supply Agreement dated May 10, 2005 between ConAgra Foods Packaged Foods Company, Inc. and Renewable Environmental Solutions LLC; including Guaranty dated July 15, 2005 by Changing World Technologies, Inc. |
| 163. | Ground Lease Agreement dated April 3, 2002 between ConAgra Foods Refrigerated Foods Co, Inc. (as assigned by ConAgra Poultry Company on October 14, 2003) and Renewable Environmental Solutions LLC; including Guaranty dated July 15, 2005 by Changing World Technologies, Inc. |
| 164. | Not Applicable. |
| 165. | Not Applicable. |
| 166. | Not Applicable. |

| 167. | Not Applicable. |
| --- | --- |
| 168. | Not Applicable. |
| 169. | Not Applicable. |
| 170. | Not Applicable. |
| 171. | Not Applicable. |
| 172. | Not Applicable. |
| 173. | Not Applicable. |
| 174. | Not Applicable. |
| 175. | Not Applicable. |
| 176. | Gas Transportation and Back-Up Sales Contract dated April 1, 2004 between ConAgra Foods Refrigerated Foods Company, Inc. and Arkansas Western Gas Company. |
| 177. | Not Applicable. |
| 178. | Amended and Restated Firm Transportation Service Agreement dated January 1, 2001 between Reliant Gas Transmission Company and Swift-Eckrich, Inc. |
| 179. | Poult Supply Agreement dated January 5, 2004 between ConAgra Foods Refrigerated Foods Company, Inc. and Ag Forte, LLC, as amended on January 1, 2005, July 6, 2005, and January 2, 2006; Guaranty dated January 5, 2004 by Willmar Poultry Company; Letter Agreement dated May 9, 2006 between ConAgra Foods and Ag Forte, LLC; and proposed new amendment and settlement agreement. |
| 180. | Poult Supply Agreement dated July 3, 2004 between ConAgra Foods Refrigerated Foods Company, Inc. (d/b/a Butterball Turkey Company) and Powell & Powell Milling, Inc., as amended December 24, 2003 and March 14, 2006. |
| 181. | Live Turkey Purchase Agreement dated July 3, 2003 between ConAgra Foods Packaged Foods Company, Inc. (as successor-in-interest to ConAgra Foods Refrigerated Foods Company, Inc. d/b/a Butterball Turkey Company) and Powell & Powell Milling, Inc., as amended December 24, 2003 and December 1, 2005; including letter agreement dated December 24, 2003 between ConAgra and Farm Credit Services of Western Arkansas. |
| 182. | Poult Growing Agreement dated March 2, 2006 between ConAgra Foods Packaged Foods Company, Inc. and Arrowhead Farms, Inc. |
| 183. | Poult Growing Agreement dated March 2, 2006 between ConAgra Foods Packaged Foods Company, Inc. and Penn-Turk, LLC. |
| 184. | The Business is a party to an agreement with each of the growers listed on Attachment "E" to <u>Exhibit 2.13</u> of the Purchase Agreement, with respect to the Huntsville, AR Facility. |
| 185. | The Business is a party to an agreement with each of the growers listed on Attachment "F" to <u>Exhibit 2.13</u> of the Purchase Agreement, with respect to the Ozark, AR Facility. |
| 186. | The Business is a party to an agreement with each of the growers listed on Attachment "G" to <u>Exhibit 2.13</u> of the Purchase Agreement, with respect to the Carthage, MO Facility. |
| 187. | Feed Delivery Agreement dated January 30, 2004 between ConAgra Foods Refrigerated Foods Company, Inc. (d/b/a Butterball Turkey Company) and Lew Thompson & Sons, Inc., as amended October 13, 2004. |
| 188. | Catch and Load Agreement dated December 8, 2004 between ConAgra Foods Packaged Foods Company, Inc. and Thoenen Custom Turkey Loading. |

189. Catch and Load Agreement dated October 26, 2005 between ConAgra Foods Packaged Foods Company, Inc. and Bill Bohannon.

190. Catch and Load Agreement dated August 19, 2004 between ConAgra Foods Refrigerated Foods Company, Inc. (d/b/a Butterball Turkey Company) and Hodson Turkey Company.

191. Feed Milling Agreement dated October 11, 2005 between ConAgra Foods Packaged Foods Company, Inc. and Jurgensmeyer Farms, Inc.

192. Feed Purchase Agreement dated January 18, 2005 between ConAgra Foods Packaged Foods Company, Inc. and Cargill Turkey Production LLC, as amended September 26, 2005, as amended March 27, 2006.

193. Promotion Agreement dated May 4, 2006 between Canadaigua Wine Company, Inc. and ConAgra Foods Packaged Foods Company, Inc.

194. Not Applicable.

195. Not Applicable.

196. Stampede Meats co-packs Butterball turkey burgers for the Business on a purchase order basis.

197. Not Applicable.

198. Not Applicable.

199. Not Applicable.

200. Not Applicable.

201. Not Applicable.

202. Not Applicable.

203. Refer to the following software related agreements:

a. Support Contract Renewal dated March 2, 2006 from Kronos to ConAgra Foods, Inc./Butterball (Huntsville, AR).

b. Not Applicable.

c. Support Contract Renewal dated December 5, 2005 from Kronos to ConAgra Foods, Inc. (Carthage, MO).

d. Support Contract Renewal dated April 3, 2006 from Kronos to ConAgra Foods/Butterball (Ozark, AR).

e. Not Applicable.

f. Not Applicable.

g. Not Applicable.

h. Not Applicable.

i. Not Applicable.

j. Support Contract Renewal from Kronos for Longmont, CO.

k. Support Contract Renewal from Kronos for Jonesboro, AR.

l. Extended Maintenance/Technical Support Service Agreement for 2006 between M-Tech Systems, Inc. and Butterball Poultry (for Carthage, MO; Huntsville, AR; and Ozark, AR).

m. Extended Maintenance/Technical Support Service Agreement for 2006 between M-Tech Systems, Inc. and ConAgra Shared Purchasing, Inc. (for Longmont, CO).

n. Not Applicable.

o. Not Applicable.

| | | |
|---|---|---|
| | p. | Not Applicable. |
| | q. | Not Applicable. |
| | r. | Not Applicable. |
| | s. | Not Applicable. |

204. Not Applicable.

205. [Reserved.]

206. Verbal agreement for month-to-month Lease with Surplus City in Huntsville, Arkansas for file storage, with rent of $500 per month.

207. Construction Agreement between ConAgra Foods Packaged Foods Company, Inc. and Eaton Excavating, Inc. dated August 8, 2005 for repairs to lagoon.

208. Industry Tract Contract between Union Pacific Railroad Company and ConAgra Foods Refrigerated Foods Co., Inc. dated as of April 1, 2003.

209. [Reserved.]

210. Not Applicable.

211. Rooftop Site Lease with Option between ConAgra Poultry Company and Western PCS II Corporation, assignee of Western PCS III License Corporation dated December 13, 1996 for a cell tower at the Platteville, Colorado feed mill.

212. Not Applicable.

213. Not Applicable.

214. Not Applicable.

215. The rights and obligations with respect to the Business under Warehouse Agreement dated May 23, 2005 between Millard Refrigerated Services, Inc. and ConAgra Foods, Inc., as amended on December 15, 2005 and April 25, 2006.

216. Not Applicable.

217. The rights and obligations with respect to the Business under Warehouse Agreement dated April 1, 2005 between Nebraska Cold Storage, Inc. and ConAgra Foods, Inc., as amended on April 1, 2006.

218. Not Applicable.

219. Not Applicable.

220. Not Applicable.

221. The rights and obligations with respect to the Business under Warehouse Agreement dated March 11, 2005 between Berkshire Refrigerated Warehousing, L.L.C. and ConAgra Foods, Inc., as amended on February 16, 2006.

222. Not Applicable.

223. Letter of Agreement dated December 2, 2005 between AmeriCold Logistics and ConAgra Foods for cold storage in the facilities in Tampa, FL; Thomasville, GA; Syracuse, NY; Marshall, MO; Garden City, KS; and Wichita, KS.

224. Not Applicable.

225. Not Applicable.

226. Not Applicable.

227. Not Applicable.

228. Not Applicable.

| | |
|---|---|
| 229. | Not Applicable. |
| 230. | Not Applicable. |
| 231. | Not Applicable. |
| 232. | Not Applicable. |
| 233. | Not Applicable. |
| 234. | Not Applicable. |
| 235. | Not Applicable. |
| 236. | Not Applicable. |
| 237. | Not Applicable. |
| 238. | Not Applicable. |
| 239. | Not Applicable. |
| 240. | Not Applicable. |
| 241. | Not Applicable. |
| 242. | Not Applicable. |
| 243. | Not Applicable. |
| 244. | Not Applicable. |
| 245. | Not Applicable. |
| 246. | [Reserved.] |
| 247. | Not Applicable. |
| 248. | Not Applicable. |
| 249. | Not Applicable. |
| 250. | Not Applicable. |
| 251. | Agreement between Business and Cargill pursuant to which the Business reimburses Cargill for lease charges incurred by Cargill with respect to equipment leased from ARI and used by the Business at the Ozark, AR Facility. |
| 252. | Not Applicable. |
| 253. | Not Applicable. |
| 254. | Not Applicable. |
| 255. | [Reserved.] |
| 256. | Not Applicable. |
| 257. | The rights and obligations with respect to the Business relating to the supply of carbon dioxide to the Longmont, CO plant by Air Liquide Industrial U.S. L.P., as set forth in the form agreement provided to Buyer to be entered into between Buyer and Air Liquide Industrial U.S. L.P. |
| 258. | Not Applicable. |
| 259. | Not Applicable. |
| 260. | Not Applicable. |
| 261. | Not Applicable. |
| 262. | Not Applicable. |

263. Commercial Sales Proposal/Agreement dated July 6, 2006 between ADT Security Services, Inc. and ConAgra.

264. All open purchase and sale orders relating to the Turkey Business and entered into in the ordinary course of business that are not Material Contracts.

265. Any other agreement, contract, obligation, promise, commitment or undertaking that relates primarily to the Turkey Business and entered into in the ordinary course of business that is not a Material Contract.

266. Not Applicable.

267. Not Applicable.

268. Not Applicable.

269. [Reserved.]

270. Not Applicable.

271. Contract Renewal for Harding and Land Applications of Residuals dated November 17, 2004 between ConAgra Foods Packaged Foods Company, Inc. a/k/a ConAgra Foods – Turkey Division and Terra Renewal Services, Inc.

272. Not Applicable.

273. Not Applicable.

274. Not Applicable.

275. Product Agreement dated May 1, 1997 between BOC Gases, a division of The BOC Group, Inc. and ConAgra Foods Packaged Foods Company, Inc. d/b/a Butterball Turkey Co.

276. Consulting Agreement dated August 31, 2006 between ConAgra Foods Packaged Foods Company, Inc. and Russell May.

277. Consignment Agreement dated October 18, 2004 between Applied Industrial Technologies, Inc. and ConAgra Foods Packaged Foods Company, Inc. (successor by merger to ConAgra Foods Refrigerated Foods Company, Inc./Butterball Turkey Company).

278. AT&T Master Agreement (MA Reference No. 20868) dated December 26, 2000, including AT&T Interactive Voice Services (IVS) Service Order Attachment dated June 28, 2002, AT&T Interactive Voice Services (IVS) Advanced Application Supplement, Amendment to AT&T Interactive Voice Services (IVS) Advanced Application Supplement dated July 21, 2004, and Amendment to AT&T Interactive Voice Services (IVS) Advanced Application Supplement dated August 29, 2006.

279. Not Applicable.

280. Acquired Footage/Still Photograph License between Butterball / ConAgra and LMNO Cable Group, Inc.

281. Supplemental Agreement dated October 23, 1997 by and among ConAgra Poultry Company and Longmont Turkey Processors, Inc., Mile High Turkey Hatchery, Inc., P&A Turkey, Inc., Leonard Strear, Sidney Strear, Sam Pluss and James Pluss.

282. Not Applicable.

283. Not Applicable.

284. Any right, title and interest ConAgra Foods Packaged Foods Company, Inc. may have in the following:

a. Oil and Gas Lease between Mile High Turkey Hatchery, Inc., lessor, and Aeon Energy Co., lessee, dated November 3, 1980, recorded December 23, 1980 in Book 923 as Reception No. 1844963, Weld County, Colorado.

b. Affidavit of Production by Calvin Petroleum Corporation dated April 30, 1981, recorded May 4, 1981 in Book 935 as Reception No. 1856754, Weld County, Colorado.

c. Oil and Gas Lease between Mile High Turkey Hatchery, Inc., lessor, and Pan American Petroleum Corporation, lessee, dated December 17, 1970, recorded February 16, 1971 in Book 640 as Reception No. 1562218, Weld County, Colorado.

d. Affidavit of Lease Extension or Production by Amoco Production Company dated October 26, 1971, recorded October 29, 1971 in Book 656 as Reception No. 1577766, Weld County, Colorado.

e. Oil and Gas Lease between Two E Ranchers, Inc., lessor, and Mel C. Bedinger, lessee, dated August 11, 1964, recorded September 6, 1964 in Book 523 as Reception No. 1444837, Weld County, Colorado.

f. Production Affidavit by Thomas G. Vessels recorded June 30, 1975 in Book 742 as Reception No. 1663934, Weld County, Colorado.

g. Oil and Gas Lease between Turfgrass Associates, Inc., lessor, and T.S. Pace, lessee, dated March 19, 1970, recorded April 21, 1970 in Book 624 as Reception No. 1545837, Weld County, Colorado.

h. Communitization Agreement by Amoco Production Company (successor lessee) recorded May 13, 1982 in Book 967 as Reception No. 1891479, Weld County, Colorado.

i. Oil and Gas Lease with XTO Energy – owner no. 462472.

j. Oil and Gas Lease with Seeco, Inc. – owner no. 231895.

k. Oil and Gas Lease with NEG Operating LLC – lease no. 10008 and 10012.

l. Right of Way and Surface Use Agreement with XTO Energy – gas well known as Burcham Heirs #5-28.


**The following Designated Contracts are assigned to the extent they relate to the Turkey Business:**

60. Agreement dated February 12, 2002 between ConAgra Brands, Inc. and E.A. Sween Company d/b/a Deli Express.

62. Co-Pack Agreement dated December 1, 2004 between ConAgra Foods Packaged Foods Company, Inc. and Sugar Creek Packing Company.

65. Co-Pack Agreement dated August 1, 2005 between ConAgra Foods Packaged Foods Company, Inc. and J&B Sausage Company, Inc., including Proposed Renewal Agreement.

70. Co-Pack Agreement dated April 1, 2004 between ConAgra Foods Packaged Foods Company, Inc. and West Liberty Foods, as amended on December 1, 2005.

73. Supply Agreement dated July 1, 2001 between ConAgra Foods Refrigerated Foods Company, Inc. (fka ConAgra Foods Foodservice Company, Inc., fka Swift-Eckrich d/b/a ASE Deli Foodservice) and American Food Distributors LLC (fka American Food Distributors, Inc.), as amended on June 10, 2003, as amended on July 1, 2004; and including Proposed Third Amendment dated June 30, 2006.

79. Term Purchase Agreement dated January 1, 2004 between ConAgra Foods Refrigerated Foods Company, Inc. and BP Products North America, as amended on January 1, 2006.

80. Standard Franchisee's Supply Agreement dated June 9, 2005 between ConAgra Foods Packaged Foods Company, Inc. and Independent Purchasing Cooperative, Inc., as amended on June 9, 2005, as amended on September 26, 2005, as amended in February 2006.

86. The rights and obligations with respect to the Business under Sponsorship Agreement dated December 6, 2004 between ConAgra Foods, Inc. and Six Flags Theme Parks, Inc., as amended by Letter Agreement dated February 15, 2006.

88. The rights and obligations with respect to the Business under Supply Agreement dated December 1, 2004 by and between ConAgra Foods Packaged Foods Company, Inc. and White Hen Pantry, Inc.

89. The rights and obligations with respect to the Business under Supply Agreement dated January 1, 2003 between ConAgra Foods Refrigerated Foods Co., Inc. and Sodexho Operations, LLC.

91.	The rights and obligations with respect to the Business under Vendor Agreement for National and Private Label Products dated December 21, 2004 between U.S. Foodservice, Inc. and ConAgra Foods Packaged Foods Company, Inc., as amended on April 20, 2005, July 22, 2005 and December 27, 2005.

92.	The rights and obligations with respect to the Business under Supplier Agreement dated June 20, 2001 between Swift-Eckrich, Inc. d/b/a ASE Foodservice Company and Aramark Food and Support Services Group, Inc., as amended on June 30, 2003, May 17, 2005, October 12, 2005, January 23, 2006 and December 31, 2005.

93.	The rights and obligations with respect to the Business under Amerinet Allowance Agreement effective June 1, 2005 between Amerinet and ConAgra Foods Packaged Foods Company, Inc.

95.	The rights and obligations with respect to the Business under Agreement dated January 25, 2006 between ConAgra Foods Packaged Foods Company, Inc. and Perishables Procurement and Merchandising Reclaim (C&S Wholesale Grocers).

114.	The rights and obligations with respect to the Business under Vendor Agreement dated March 18, 2005 by and between Perishables Group, Inc. and ConAgra Foods Packaged Foods Company, Inc.

116.	The rights and obligations with respect to the Business under Distribution Agreement dated June 26, 2003, between Agencias Feduro, S.A., ConAgra Panama, Inc., ConAgra Grocery Products Company, and ConAgra Foods, Inc. d/b/a ConAgra Snacks Food Group, as extended on July 6, 2006; Proposed Distribution Agreement between ConAgra Panama, Inc. and Agencias Feduro, S.A.

135.	The rights and obligations with respect to the Business under Carbon Dioxide Equipment Rental Agreement dated March 30, 2004 between ConAgra Foods, Inc. and BOC Gases.

166.	The computer equipment listed on Attachment "A" to Exhibit 2.13 of the Purchase Agreement is leased pursuant to master lease agreements between ConAgra Foods, Inc. and the respective Lessors noted on Attachment "A" to Exhibit 2.13 of the Purchase Agreement.

167.	The copier equipment listed on Attachment "B" to Exhibit 2.13 of the Purchase Agreement is leased pursuant to master lease agreements between ConAgra Foods, Inc. and the respective Lessors noted on Attachment "B" to Exhibit 2.13 of the Purchase Agreement.

168.	The vehicles and other equipment listed on Attachment "C" to Exhibit 2.13 of the Purchase Agreement are leased pursuant to master lease agreements between ConAgra Foods, Inc. and the respective Lessors noted on Attachment "C" to Exhibit 2.13 of the Purchase Agreement.

169.	The mail meter equipment listed on Attachment "D" to Exhibit 2.13 of the Purchase Agreement is leased pursuant to a master lease agreement between ConAgra Foods, Inc. and Pitney Bowes.

203.	Refer to the following software related agreements:

n.	The rights and obligations with respect to the Business under Software Support Purchase Agreement dated June 1, 2004 between ConAgra Foods, Inc. and Resource Optimization, Inc.

o.	The rights and obligations with respect to the Business under License Purchase Agreement dated September 17, 2004 between ConAgra Foods, Inc. and Resource Optimization, Inc.

p.	The rights and obligations with respect to the Business under Software and Application Service Provider Master Agreement dated September 1, 2002 between Americold Logistics, LLC and ConAgra Foods, Inc.

q.	Software License Agreement dated September 11, 2000 between Hyperion Solutions Corporation and ConAgra, Inc., including Addendum A and Addendum B thereto, each dated September 11, 2000.

| r. | The rights and obligations with respect to the Business under Basic License Agreement Number 4778 dated April 30, 1999 between ConAgra, Inc. and Logility, Inc., including Implementation Assistance Amendment Number One dated April 30, 1999, Addendum One dated October 26, 1999 and Addendum Two dated June 30, 2000. |

214. The rights and obligations with respect to the Business under Warehouse Agreement dated May 23, 2005 between AmeriCold Logistics, LLC and ConAgra Foods, Inc.

218. The rights and obligations with respect to the Business under Warehouse Agreement dated September 16, 2005 between Interstate Warehousing, Inc. and ConAgra Foods, Inc.

219. The rights and obligations with respect to the Business under Warehouse Agreement dated April 18, 2005 between Zero Mountain, Inc. and ConAgra Foods, Inc., as amended on May 27, 2005.

220. The rights and obligations with respect to the Business under Warehouse Agreement dated May 20, 2005 between Henningsen Cold Storage Co. and ConAgra Foods, Inc., as amended on May 20, 2006.

224. Offer Letter dated October 28, 2005 by Emerald Coast Finest Produce Co., for cold storage in the Pensacola, FL facility.

225. Rate Quote by Claxton Cold Storage in favor of ConAgra Foods for cold storage in the Claxton, GA facility.

226. Rate Schedule by ICS in Jacksonville, FL in favor of ConAgra Foods for cold storage in the Jacksonville, FL facility.

227. Letter of Agreement dated December 9, 2004 between USCold and ConAgra Foods for cold storage in the facilities in Medley, FL and Orlando, FL.

236. Cold Storage Agreement dated December 13, 2004 between Logisco Central Cold Storage and ConAgra Foods for cold storage in the North Little Rock, AR facility.

237. Warehouse Contract and Rate Quotation between Springfield Refrigerated Warehouse, Inc., and ConAgra Foods for cold storage in the Springfield, MO facility.

247. The rights and obligations with respect to the Business under Supply Agreement dated January 17, 2003 between ConAgra Foods, Inc. and EPCO Carbon Dioxide Products, Inc., as amended on January 5, 2006.

248. The rights and obligations with respect to the Business under Supply Agreement dated December 5, 2002 between ConAgra Foods, Inc. and Ethanol Products CO2, as amended on March 23, 2006.

249. Settlement Agreement dated August 15, 2005 between Jonmor Investments, Inc., John Morrell & Co. and ConAgra Foods Packaged Foods Company, Inc.

250. Concurrent Use Agreement dated July 20, 2005 between Hormel Foods, LLC and ConAgra Foods Packaged Food Company, Inc.

258. The rights and obligations with respect to the Business relating to the supply of liquid nitrogen to the Junction City, KS, Longmont, CO, Omaha, NE, Peru, IN, St. Charles, IL (BNS), St. Charles, IL (Dry), St. James, MN, and Hastings, NE plants by Air Liquide Industrial U.S. L.P., as set forth in the form agreement provided to Buyer to be entered into between Buyer and Air Liquide Industrial U.S. L.P.

259. The rights and obligations with respect to the Business under Warehouse Agreement dated May 10, 2005 by and between Industrial Cold Storage, Inc. and ConAgra Foods, Inc., including Proposed First Amendment.

260. The rights and obligations with respect to the Business under Warehouse Agreement dated February 15, 2005 by and between Frostyaire of Arkansas and ConAgra Foods, Inc., as amended on February 14, 2006.

261. The rights and obligations with respect to the Business under Warehouse Agreement dated September 16, 2005 by and between Interstate Warehousing, Inc. and ConAgra Foods, Inc.

262. The rights and obligations with respect to the Business under Warehouse Agreement dated May 15, 2005 by and between Cloverleaf Cold Storage Co. and ConAgra Foods, Inc., as amended on May 15, 2006.

264. All open purchase and sale orders relating to both the Business as a whole (as opposed to either the Turkey Business or the remainder of the Business exclusively) and entered into in the ordinary course of business that are not Material Contracts.

265. Any other agreement, contract, obligation, promise, commitment or undertaking that relates primarily to the Business as a whole (as opposed to either the Turkey Business or the remainder of the Business exclusively) and entered into in the ordinary course of business that is not a Material Contract.

268. The rights and obligations with respect to the Business under Telephone Marketing Services Agreement dated November 1, 2003 between Covergys Customer Management Group, Inc. and ConAgra Foods, Inc.

272. The rights and obligations with respect to the Business under National Account Services Agreement dated June 1, 2004 between ConAgra Foods, Inc. and Aramark Uniform Services, a division of Aramark Uniform & Career Apparel, Inc.

273. Supply Agreement dated July 1, 2006 between ConAgra Foods Packaged Foods Company, Inc. and Anchor Packaging, Inc.

274. The rights and obligations with respect to the Business under National Account Services Agreement dated June 30, 2004 between ConAgra Foods, Inc. and G&K Services, Inc.

279. The rights and obligations with respect to the Business under National Customer Development and National Account Agreement dated June 1, 2005 between Kimberly-Clark Global Sales, Inc. and ConAgra Foods, Inc.

283. The rights and obligations with respect to the Business under Warehouse Agreement dated April 1, 2005 between United States Cold Storage, LP. and ConAgra Foods, Inc., as amended on April 1, 2006.

## Exhibit "B"

## Assumed Liabilities

- All liabilities and obligations reflected in the Closing Turkey Working Capital Amount;

- The obligations under the Turkey Contracts relating to periods from and after the Effective Time;

- The obligations under the Mixed Contracts relating to periods from and after the Effective Time, to the extent related to the Turkey Business;

- The Assumed Environmental Liabilities solely to the extent related to the Dedicated Turkey Locations;

- Subject to Section 5(c) of this Agreement, Pre-Closing Contingent Liabilities to the extent excluded from Seller's indemnity obligations as a result of the application of Section 16.4.2 of the Purchase Agreement;

- Any other liability or obligation specifically assumed by Buyer pursuant to the terms of the Purchase Agreement to the extent related to the Turkey Business;

- Any remaining expenditures, and any contracts, agreements and purchase orders relating to Approved Projects (as defined in the Acknowledgement Agreement dated August 16, 2006 by and between Seller and Smithfield, as amended (the **"Acknowledgement Agreement"**)) remaining at the time of Closing, to the extent related to the Turkey Business;

- Any obligations (other than outstanding accounts payable) under the Open P.O.'s (as defined in the Acknowledgement Agreement) remaining at the time of Closing, to the extent related to the Turkey Business; and

- The following matters:

A.    **Claims**

1.    Certain Butterball trademarks (as provided therein) are subject to the License Agreement dated November 30, 1987 between Swift-Eckrich, Inc., as licensor, and Butterball Foods Limited, as licensee. Cranberry Foods Limited has notified Seller it is the new licensee as successor to Butterball Foods Limited.

2.    Joyce Dews v. Aldi, Inc. and ConAgra Refrigerated Foods, Case No. CA605-22188, Circuit Court for Prince George's County, Maryland

3.    Pamela S. Swaim v. Robert L. Munden and ConAgra Foods Packaged Foods Co., Inc., Case No. 05AO-CC00348, Circuit Court of Jasper County, Missouri

4.    ABB Commercial – Jonesboro, Arkansas. Seller purchased from ABB Commercial a robotic palletizing machine for Seller production facilities located in Jonesboro, Arkansas. Seller has received a written demand for payment for two repair invoices on the machine in the amount of $11,875.58. Seller has refused to make additional payments on the repair invoices for work which has not repaired the machine. ABB has threatened suit on the invoice, but to date, no suit is on file.

16

US2000 9490672.3

5. Open liability claims listed in Attachment "C" to Section 9.12 of the Disclosure Schedule where location indicated is a Dedicated Turkey Location, but not including claim #A48100026-1 constituting a Retained Known Liability under the Purchase Agreement.

6. Any potential impact on the Turkey Business with respect to <u>Alvarez v. IBP</u>, except for any back-pay liability as described as item 9 on <u>Exhibit 4(a)</u> to the Purchase Agreement.

7. Matters listed on Attachment "D" to Section 9.14 of the Disclosure Schedule that relate to a Dedicated Turkey Location.

8. Pending grievances set forth on <u>Exhibit 9.14(b)</u> to the Purchase Agreement that relate to a Dedicated Turkey Location.

**B.     Environmental**

**General Environmental:**

1. Failure to execute EPA air compliance agreement relating to ammonia emissions from animal feeding operations.

2. Litigation initiated by the State of Oklahoma alleging pollution in 13 watersheds in eastern Oklahoma.

3. Any liability resulting from failure to timely apply for, obtain or renew Environmental Permits prior to the closing date.

**Carthage, MO Production Facility – Environmental:**

1. June 2005 Notice of Violation issued for exceedance of TSS limit in wastewater permit.

2. Deficiencies with storm water best management practices, as disclosed by letter dated April 18, 2005.

3. Exceedances of wastewater permit limits identified in discharge monitoring reports from January 2005 through February 2006.

4. Failure to register five ASTs.

5. Poor condition of asbestos containing materials, as described in 1996 asbestos investigation report.

6. Operating without an Air Operating Permit.

17

**Huntsville, AR Production Facility – Environmental:**

1. Deficiencies with storm water management program, as evidenced by high TKN monitoring results, outdated storm water pollution prevention plan and issued identified in February 2005 letter from Arkansas Department of Environmental Quality.

2. Poor condition of asbestos containing materials, as described in 1999 asbestos investigation report.

3. Trash and debris on eastern property boundary.

4. Former UST area.

**Jonesboro, Arkansas Production Facility – Environmental:**

1. Release of 108 pounds of ammonia on March 28, 2005.

2. Exceedances of TSS limitations in wastewater permit in January 2006. Reporting deficiencies in monthly monitoring reports (failure to record flow as required by permit and incorrect permit limitations noted in monitoring report).

3. Staining in barrel corral area and standing water with oil sheen.

4. Equipment boneyard.

5. Hydrocarbon staining around waste oil AST and former containment area.

6. Operating without a storm water permit.

**Longmont, Colorado (Butterball Plant) Production Facility and Farms – Environmental:**

1. December 20, 2004 release of ammonia vapor.

2. Exceedances of wastewater permit limits in August 2005. Failure to record pH levels in accordance with permit requirements.

3. Corrective action associated with leaking USTs.

4. Stained soil east of drum storage area.

5. Oil/water separator containing oily water.

6. Registration/permitting requirements associated with 10,000 gallon AST.

7. Operating farms without CAFO permits.

8. Operating plant without air permit or air pollution emission notices.

**Ozark, Arkansas Production Facility – Environmental:**

1. Deficiency noted in August 2002 NPDES inspection report.

2. Failure to submit TRI Form R for anhydrous ammonia (1995-1998) and for chlorine (1998-1999), if required.

3. Reporting deficiencies in wastewater monitoring reports.

18

US2000 9490672.3

4. Four improperly closed USTs removed from the site in 1993; a fifth UST, targeted for removal but never located; 5 USTs removed in 1989; absence of closure letter regarding April 11, 2003 UST closure report.

5. Poor condition of asbestos containing materials, as described in 1998 asbestos investigation report.

6. Failure to register two fuel ASTs.

### Carthage, Missouri (Columbus, Kansas) Feed Mill – Environmental:

1. Operating and discharging without a wastewater permit.

### Longmont, Colorado (Platteville, Colorado) Feed Mill – Environmental:

1. Operating and discharging without a wastewater permit; noncompliance with Ceriodaphnia Dubia lethality in first quarter 2005.

2. Debris pile containing scrap metal and a drum container, located near the northern portion of the western border of the site.

3. Abandoned well onsite.

4. Failure to register 2000 gallon AST.

### Ozark, Arkansas (Alix, Arkansas ) Feed Mill – Environmental:

1. Consent Administrative Order entered into between ADEQ and site's prior owner in 2001 after an unpermitted discharge.

2. Failure to register and/or obtain closure documentation for unused 13,000-gallon AST.

3. Removal of 3 fuel USTs in 1989.

4. Poor condition of asbestos containing materials, as described in 1998 asbestos investigation report.

### Longmont, Colorado Truck Maintenance Facility – Environmental:

1. Former sand/oil separator used as a wastewater holding tank.

2. Former leach field.

3. Two 200-gallon fuel ASTs lacking secondary containment or a protective barrier.

4. Several drums, dispensing tanks, and parts-washing stations observed without secondary containment.

5. Three ASTs located on an overhead steel rack without secondary containment and without protection from vehicle contact against the rack legs.

6. Spilled waste oil near mechanic's pit.

7. Grated floor drain in maintenance building stained with oil and antifreeze.

### Longmont (Platteville), Colorado Feed Laboratory Facility – Environmental:

Two ASTs without secondary containment located southwest of the maintenance building.

US2000 9490672.3

# EXHIBIT B

# EXHIBIT B

IN THE CIRCUIT COURT OF JASPER COUNTY
STATE OF MISSOURI

BUTTERBALL, LLC, )
)
Plaintiff, )
)
v. )    Case No. 15AO-CC0087
)
RENEWABLE ENVIRONMENTAL )
SOLUTIONS, L.L.C., )
)
Defendant. )

*FILED*
*Melissa Holcomb - Clerk*
*6/29/2016*
*JASPER COUNTY CIRCUIT CLERK*
*JOPLIN, MISSOURI*

RECEIVED

JUN 2 9 2016

JASPER COUNTY CIRCUIT COURT
DIVISION II

### DEFAULT JUDGMENT AGAINST
### DEFENDANT RENEWABLE ENVIRONMENTAL SOLUTIONS, LLC

On this 29th day of June, 2016, the above-captioned case was presented to the Court. Plaintiff Butterball, LLC, appeared by and through its attorney, John A. Ruth. Defendant Renewable Environmental Solutions, LLC, although being served with process pursuant to Missouri law, was in default for failing to file a responsive pleading and did not appear.

WHEREUPON, this cause is submitted to the Court on Plaintiff's Petition, evidence and proof adduced and, after considering the same, along with proof of service on Defendant Renewable Environmental Solutions, LLC, the Court finds as follows:

1.      Plaintiff Butterball, LLC ("Plaintiff Butterball") is a North Carolina limited liability company in good standing to conduct business in Missouri.

2.      Defendant Renewable Environmental Solutions, LLC ("Defendant RES") is a Delaware limited liability company in good standing to conduct business in Missouri.

3.      On or about April 3, 2015, Defendant RES was served with a copy of Plaintiff Butterball's Petition and Summons with proof of service being filed with this Court on April 14, 2015.

4.      Plaintiff Butterball is the owner of real property located at 530 North Main Street, Carthage, Missouri, and more particularly described as follows:

1

A TRACT OF LAND LOCATED IN THE SOUTHWEST QUARTER OF SECTION 34, TOWNSHIP 29 NORTH, RANGE 31 WEST, AND IN "NORTH CARTHAGE", A RECORDED SUBDIVISION IN JASPER COUNTY, MISSOURI, IN THE CITY OF CARTHAGE, JASPER COUNTY, MISSOURI, MORE PARTICULARLY DESCRIBES AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF LOT 601 IN "NORTH CARTHAGE" IN SAID SOUTHWEST QUARTER;
THENCE, NORTH 00°28'09" WEST, ALONG THE EAST RIGHT-OF-WAY LINE OF "MAIN STREET", 855.33 FEET;
THENCE, NORTH 90°00'00" EAST, 617.76 FEET;
THENCE, SOUTH 71°50'12" EAST, 223.29 FEET, TO THE POINT OF BEGINNING;
THENCE, NORTH 00°00'00" EAST, 77.73 FEET;
THENCE, NORTH 90°00'00" EAST, 410.04 FEET;
THENCE, SOUTH 00°28'09" EAST, 25.80 FEET;
THENCE NORTH 89°31'51" EAST, 27.41 FEET;
THENCE, SOUTH 00°00'00" WEST, 254.84 FEET;
THENCE, NORTH 90°00'00" WEST, 437.56 FEET;
THENCE, NORTH 00°00'00" EAST, 202.70 FEET, TO THE POINT OF BEGINNING.
CONTAINING 2.80 ACRES, MORE OR LESS.

(hereinafter "the Leased Property").

5.      RES is lessee under a ground lease for the Leased Property. A true and accurate copy of the ground lease agreement was attached to Plaintiff Butterball's Petition as Exhibit 2.

6.      The ground lease requires RES to make monthly payments for rent on the first day of every month in the amount of One Thousand Two Hundred Fifty and no/100 Dollars ($1,250.00).

7.      RES has failed to pay the monthly rent for the Leased Property for the months of October 1, 2014, through June 1, 2016, a total of twenty-one (21) months, such that past due rent now owed is Twenty-Six Thousand Two Hundred Fifty and no/100 Dollars ($26,250.00).

8.      The ground lease also requires RES to pay the real estate taxes for the Leased Property.

2

9. RES has failed to pay real estate taxes for the Leased Property for 2013, 2014 and 2015.

10. The sum of One Thousand Three Hundred Six and 49/100 Dollars ($1,306.49) is due and owing for real estate taxes for tax years 2013 through 2015.

11. In addition, the ground lease provides Butterball with the right to recover its reasonable attorneys' fees incurred in recovering possession of the Leased Property upon default by Defendant RES.

12. Butterball has incurred reasonable attorney's fees incurred in bringing this action in the sum of Twenty-Two Thousand Three Hundred Thirty-Eight and 50/100 Dollars ($22,338.50).

13. Butterball has made written demand for the rent due, and the payment of past-due real estate taxes.

14. RES has not made the rent and real estate tax payments demanded by Butterball.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that:

A. Plaintiff Butterball shall have possession and restitution of the real estate located at 530 North Main Street, Carthage, Missouri, which real estate is more specifically described as follows:

A TRACT OF LAND LOCATED IN THE SOUTHWEST QUARTER OF SECTION 34, TOWNSHIP 29 NORTH, RANGE 31 WEST, AND IN "NORTH CARTHAGE", A RECORDED SUBDIVISION IN JASPER COUNTY, MISSOURI, IN THE CITY OF CARTHAGE, JASPER COUNTY, MISSOURI, MORE PARTICULARLY DESCRIBES AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF LOT 601 IN "NORTH CARTHAGE" IN SAID SOUTHWEST QUARTER;
THENCE, NORTH 00°28'09" WEST, ALONG THE EAST RIGHT-OF-WAY LINE OF "MAIN STREET", 855.33 FEET;
THENCE, NORTH 90°00'00" EAST, 617.76 FEET;
THENCE, SOUTH 71°50'12" EAST, 223.29 FEET, TO THE POINT OF BEGINNING;

3

THENCE, NORTH 00°00'00" EAST, 77.73 FEET;
THENCE, NORTH 90°00'00" EAST, 410.04 FEET;
THENCE, SOUTH 00°28'09" EAST, 25.80 FEET;
THENCE NORTH 89°31'51" EAST, 27.41 FEET;
THENCE, SOUTH 00°00'00" WEST, 254.84 FEET;
THENCE, NORTH 90°00'00" WEST, 437.56 FEET;
THENCE, NORTH 00°00'00" EAST, 202.70 FEET, TO THE POINT OF
BEGINNING.
CONTAINING 2.80 ACRES, MORE OR LESS.

B.    Plaintiff Butterball shall have  judgment against Defendant RES for past-due rent

in the sum of Twenty-Six Thousand Two Hundred Fifty and no/100 Dollars

($26,250.00);

C.    Plaintiff Butterball shall have judgment against Defendant RES for unpaid real

estate taxes owed under the Lease in the sum of One Thousand Three Hundred

Six and 49/100 Dollars ($1,306.49);

D.    Plaintiff Butterball shall have judgment against Defendant RES for attorney fees

incurred in bringing this action in the sum of Twenty-Two Thousand Three

Hundred Thirty-Eight and 50/100 Dollars ($22,338.50).

E.    That the costs of this action are assessed against Defendant RES.

F.    Interest shall accrue on the past-due rent judgment at the ~~statutory~~ *contract* rate of twelve

percent (12%) and on the balance of the judgment at the statutory rate of interest.

IT IS FURTHER ORDERED that this Judgment is subject to execution and garnishment

in accordance with law.  Any request for damages to the above-described real estate caused by

Defendant cannot be considered by the Court in this action determined to be brought under

Chapter 535, RSMo.  Any such claim must be brought in a separate action.

IT IS SO ORDERED.

COURT SEAL OF

JASPER COUNTY

_____
CIRCUIT JUDGE DAVID C. DALLY

Date: _____6/29/16_____

4