Mark J. Giunta (#015079)
Liz Nguyen (#030282)
Law Office of Mark J. Giunta
531 East Thomas Road, Suite 200
Phoenix, Arizona 85012
Phone (602) 307-0837
Fax (602) 307-0838
Email markgiunta@giuntalaw.com
Email liz@giuntalaw.com

*Attorneys for Debtor*

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 Proceeding |
| | Case No. 2:17-bk-14387-PS |
| RDX TECHNOLOGIES CORPORATION, | **DEBTOR'S CONTROVERTING AND SEPARATE STATEMENT OF FACTS IN RESPONSE TO MOTION FOR SUMMARY JUDGMENT ON PLAN CONFIRMATION** |
| Debtor. | |
| | Hearing Date:     October 2, 2018 |
| | Hearing Time:     11:00 a.m. |
| | Hearing Location:  Courtroom 601 |

RDX Technologies Corporation ("Debtor" or "RDX"), by and through undersigned counsel, hereby submits this statement specifying those paragraphs in CWT Canada II Limited Partnership ("CWT"), Resource Recovery Corporation ("RRC"), and GEM Holdco, LLC's ("GEM") (collectively, "Litigation Creditors") Statement of Facts ("OSOF") which are disputed, and its separate statement of facts in support of the Response to Motion for Summary Judgment.

### DEBTOR'S CONTROVERTING STATEMENT OF FACTS

**Claims of CWT and RRC.**

1.     Debtor admits paragraph 1 of the OSOF.

2.     Debtor admits paragraph 2 of the OSOF.

3.     Debtor controverts the assertion in paragraph 3 of the OSOF. Declaration of

Anthony Ker in Support of Debtor's response to Motion for Summary Judgment on Plan Confirmation ("Dec."), ¶ 2, attached hereto as **Exhibit 1**.

4. Debtor admits paragraph 4 of the OSOF.

5. Debtor controverts the assertion in paragraph 5 that CWT and RRC have an allowed claim in this case. Dec., ¶ 3.

6. Debtor admits paragraph 6 of the OSOF.

**GEM's Claims.**

7. Debtor admits paragraph 7 of the OSOF.

8. Debtor admits paragraph 8 of the OSOF.

9. Debtor admits paragraph 9 of the OSOF.

10. Debtor controverts the assertion in paragraph 10 of the OSOF. Dec., ¶ 4.

11. Debtor admits paragraph 11 of the OSOF.

12. Debtor controverts the assertion in paragraph 12 that GEM has an allowed claim in this case.

**Debtor's 2015 Bankruptcy Filing.**

13. Debtor admits paragraph 13 of the OSOF.

14. Debtor controverts the assertion in paragraph 14 of the OSOF.

15. Debtor controverts the assertion in paragraph 15 of the OSOF.

16. Debtor admits paragraph 16 of the OSOF.

17. Debtor admits paragraph 17 of the OSOF.

**Debtor's Current Bankruptcy.**

18. Debtor admits paragraph 18 of the OSOF.

19. Debtor admits paragraph 19 of the OSOF.

20. Debtor admits paragraph 20 of the OSOF.

21. Debtor admits paragraph 21 of the OSOF.

22. Debtor admits paragraph 22 of the OSOF.

**Debtor's Plan**.

    **1.**    **Classification and Treatment of Unsecured Claims.**

23. Debtor admits paragraph 23 of the OSOF.

24. Debtor admits paragraph 24 of the OSOF.

25. Debtor admits paragraph 25 of the OSOF.

26. Debtor admits paragraph 26 of the OSOF.

27. Debtor admits paragraph 27 of the OSOF.

28. Debtor admits paragraph 28 of the OSOF.

29. Debtor controverts the assertion in paragraph 29 that trade vendors are not defined. (DE 49, Disclosure Statement in Support of Plan of Reorganization, hereinafter, "DS").

30. Debtor admits paragraph 30 of the OSOF.

31. Debtor admits paragraph 31 of the OSOF.

32. Debtor controverts the assertion in paragraph 32 that neither the Plan nor Disclosure Statement states why the unsecured claims of equal priority separately classified and treated the same. (DS).

    **2.**    **Plan Voting.**

33. Debtor controverts the assertion in paragraph 33 that CWT and RRC timely voted their claim against the Plan. (DE 98, 100).

34. Debtor controverts the assertion in paragraph 34 that GEM timely voted its claim against the Plan. (DE 102).

35. Debtor controverts the assertion in paragraph 35 that between CWT/RRC and GEM that a total of $16,690,025.62 in general, non-priority unsecured claims voted against the Plan. (DE 98, 100, 102).

36. Debtor admits paragraph 36 of the OSOF.

1    37.    Debtor admits paragraph 37 of the OSOF.

2    38.    Debtor admits paragraph 38 of the OSOF.

3    39.    Debtor admits paragraph 39 of the OSOF.

4    40.    Debtor admits paragraph 40 of the OSOF.

5    41.    Debtor admits paragraph 41 of the OSOF.

6    42.    Debtor admits paragraph 42 of the OSOF.

7    43.    Debtor controverts the assertion in paragraph 43 of the OSOF. At the time of the

8    confirmation hearing Greenberg Traurig ("GT") had an allowed claim in this case.

9    44.    Debtor admits paragraph 44 of the OSOF.

10    45.    Debtor admits paragraph 45 of the OSOF.

11    46.    Debtor controverts the assertion in paragraph 46 that GT was not entitled to vote

12    on the Plan. (DE 96).

13    47.    Debtor amended the Schedules and removed the disputed designation of GT's

14    claim prior to the confirmation hearing in this matter. *Id.* Debtor controverts the balance of facts

15    asserted in paragraph 47 of the OSOF. *Id.*

16    48.    Debtor controverts the assertion in paragraph 48 that there were two rejecting

17    votes or that the accepting non-priority non-insider ballots comprised only 8% of the eligible

18    voting claims. (DE 97).

19    **Dennis Danzik and His Bankruptcies.**

20    49.    Debtor admits paragraph 49 of the OSOF.

21    50.    Debtor admits paragraph 50 of the OSOF.

22    51.    Debtor admits paragraph 51 of the OSOF.

23    52.    Debtor admits paragraph 52 of the OSOF.

24    53.    Debtor admits paragraph 53 of the OSOF.

25    54.    Debtor admits paragraph 54 of the OSOF.

55. Debtor admits paragraph 55 of the OSOF.

56. Debtor admits paragraph 56 of the OSOF.

57. Debtor admits paragraph 57 of the OSOF.

58. Debtor admits paragraph 58 of the OSOF.

59. Debtor admits paragraph 59 of the OSOF.

**Claims of Debtor and Danzik Against CWT/RRC.**

60. Debtor admits paragraph 60 of the OSOF.

61. Debtor admits paragraph 61 of the OSOF.

62. Debtor admits paragraph 62 of the OSOF.

63. Debtor admits paragraph 63 of the OSOF.

64. Debtor controverts the assertion in paragraph 64 that the claims were barred by res judicata based on the CWT Judgment. The District Court judge ruled that it was dismissing the claims in Arizona District Court so they could proceed in jurisdiction of the Canadian Court in Alberta, Canada where they were already pending. (Campbell Order).

**Debtor's Insolvency.**

65. Debtor admits paragraph 65 of the OSOF.

66. Debtor set forth in Schedule B causes of action against CWT and GEM with potentially substantial damages but currently unliquidated with an unknown market value and pending action for the same in the Queen's Bench Canadian Court in Alberta, Canada, Case No. 1402-09394 (DE 29, SOFA No. 7). More recently, on August 8, 2018, based in part on new evidence Debtor filed an Amended Statement of Claim that quantified a damage claim in the amount of $80,000,000. (Amended Statement of Claim). This asset is in addition to the other assets set forth in paragraph 66 of the OSOF. To the extent that paragraph 66 of the OSOF omits this asset, it is controverted.

67. Debtor admits paragraph 67 of the OSOF.

68. Debtor admits paragraph 68 of the OSOF.

## DEBTOR'S SEPARATE STATEMENT OF FACTS IN SUPPORT OF RESPONSE TO MOTION FOR SUMMARY JUDGMENT

### A.    **RDX Business Background.**

1.    RDX Technologies Corporation ("RDX") is a foreign corporation domiciled in Canada since its incorporation on or about July 30, 2003[1]. (DS, p. 14; Dec., ¶ 5).

2.    Debtor had operated an environmental service business in Alberta and a wastewater treatment business for customers in the oil fracking industry. Debtor directly provided the wastewater treatment service to customers located in Canada, while a wholly owned United States subsidiary of Debtor, Ridgeline Energy Services (USA), Inc. ("Ridgeline USA"), provided the same waste water service to customers located in the United States. (DS, p. 14; Dec., ¶ 6).

3.    RDX's wastewater treatment business was for a time successful at its height generating approximately $CDN 30 MILLION in annual revenues in 2014. (DS, p. 14; Dec., ¶ 7).

4.    Due to the two negative events of the collapse of oil (from over $100 a barrel to less than $30 a barrel in 2015) and RDX's acquisition of a fraudulent recycling Plant and ensuing litigation and expenses therefrom, Debtor became insolvent and subsequently sought bankruptcy protection. (DS, p. 15; Dec., ¶ 8).

5.    Debtor and its subsidiary used a proprietary process and technology, i.e., trade secrets (hereinafter "Proprietary Technology"), in the delivery of the wastewater treatment service. (*Id.*; Dec., ¶ 9).

6.    The Trade Vendors set forth in Exhibit 6 of the Disclosure Statement and comprising Class 4 of the Plan provided critical goods and support for the deployment of the

Proprietary Technologies in RDX's wastewater treatment business and prior to Debtor's insolvency receiving substantial revenues on account of the same. (DS, Exhibit 1, Plan and Exhibit 6, Trade Vendor List; Dec., ¶ 10).

7.     Upon Debtor restarting its wastewater treatment business, the Trade Vendors have the opportunity to generate and receive substantial revenues from Debtor going forward. (DS, Exhibit 5, Projections; Dec., ¶ 11).

> **1.     Fraudulent Diesel Fuel Recycling Plant Purchase and Resulting Litigation and Claims.**

8.     On or about May 2013, Debtor entered into an agreement to purchase a plant (the "Plant") to process waste products into renewable fuel that would qualify under the Energy Policy Act for fuel tax credits from Changing World Technologies, L.P., a Delaware limited partnership ("CWT Affiliate"). (Unit Purchase Agreement). The purchase was to include the acquisition of all the equity of CWT (which owned and operated the Plant) and wholly owned subsidiary Resource Environmental Solutions (RES), which had the rights to collect on the fuel tax credits. (DS; Dec., ¶ 13).

9.     The affiliation between GEM and the CWT Affiliate is that Ed Tobin was an officer of both entities and controlled the operation of the Plant on behalf of CWT. (Dec., ¶ 13). GEM was a minority owner of the CWT Affiliate (approximately 30%) and was active in the CWT Affiliate's management and efforts to promote the sale of the CWT Affiliate's business (the CWT Plant) to RDX. Ed Tobin made initial contact with Debtor regarding the acquisition of the Plant and promoted the same. (*Id.*).

10.     The CWT acquisition was anticipated to complement the RDX wastewater treatment technology. The RDX technology would collect wastewater with oils, fats and grease in the water. (DS, p. 15; Dec., ¶ 14).

---

[1] The Debtor's original corporate name was "Ridgeline Energy Services Inc." until it was changed to "RDX

11.     The RDX technology would strip out the oil, fat and grease and treat the water for cleaner disposal. The CWT Missouri facility and the associated technology was represented to convert the oils, fats and grease collected by the RDX technology and convert it to a Renewable diesel eligible for the federal program of RINS and tax credit for the production and sale of renewable diesel. (DS, p. 15; Dec., ¶ 15).

12.     After the Plant purchase, users of the recycled fuel reported to Debtor that the quality of fuel produced was so bad that it caused significant problems by destroying their fuel handling equipment. (DS, p. 15; Dec., ¶ 16). Debtor was required to spend significant funds to fix the problem. (DS, p. 15; Dec., ¶ 16).

13.     Debtor subsequently learned that the Plant was incapable of producing a qualifying renewable fuel prevented Debtor from collecting financial incentives in the form of RINs and tax credits that was the only reason for profitability of the Plant. (DS, p. 15; Dec., ¶ 17).

14.     Debtor attempted to produce a non-qualifying product to be sold at a significantly reduced price without the financial incentives of the qualifying product. *Id.* However, when the price of oil dropped significantly in late 2014, Debtor could not produce the non-qualifying fuel at a profit. (DS, p. 15-16; Dec., ¶ 18).

15.     RDX losing the ability to sell qualifying fuel reduced the effective revenues to the CWT refinery of between 40-50%, effectively making any fuel produced to done at a loss. Coupled with the damage the fuel did to clients' equipment meant RDX had to complete over a $1,000,000 of repairs to the customers equipment. (Dec., ¶ 19).

16.     Litigation amongst the various parties resulted as a consequence of the Plant's inability to produce recycled fuel and the expense of the litigation and exorbitant cost bond effectively drained any funds from Debtor. (DS, p. 15-16; Dec., ¶ 20).

17.     Much later in 2017, after certain litigation had occurred, Debtor discovered new

Technologies Corporation" on 21 August 2013.

evidence establishing with particularity how CWT's prior operation of the Plant, procurement of fuel tax credits, and its subsequent sale to Debtor was a fraud on the United States Government and Debtor. (CPLR 5015 Memorandum, p. 12-13, 16-19). The former plant manager detailed the instrumentality of the fraud in a sworn affidavit including the use of purposely manipulated independent laboratory analysis. (DS, p. 17; Dec., ¶ 21). That fraud was compounded by a subsequent concealment of evidence and obstruction in the ensuing litigation regarding the Plant by an agent of CWT. (DS, p. 3-11, 13-14; Dec., ¶ 21).

18.    The New York judgment was a default judgment awarded and all RDX's defenses struck, because RDX failed to deliver discovery materials to the court. (Dec., ¶ 22). The new evidence found in 2017 shows that the CFO Candie Blazar had conspired to destroy, hide or steal the discovery material and conspired with CWT to do so. (*Id.*). The result was that RDX could not have satisfied the court ordered discovery requests. (*Id.*). The new evidence found forms the basis for the 5015 filing in New York so that the judgments are vacated and that RDX get another chance to have a fair hearing. (*Id.*).

19.    In order to comply with, and mitigate or avoid any taxing authority claims against Debtor related to this activity by the predecessor Plant owner, it is in Debtor's legal and economic interest to develop and present these facts related to this fraud. Through counsel, Debtor has been in discussion with IRS Special Agents regarding a Whistle Blower action. (Dec., ¶ 23).

20.    In 2013, GEM Holdco, LLC ("GEM") filed a lawsuit against Debtor (and others) in New York, styled *GEM Holdco, LLC et al. v. CWT Canada II Limited Partnership et al.*, Index 650841/2013, New York Supreme Court, County of New York ("First Action"). (DS, p. 16; Dec., ¶ 24).

21.    RDX and GEM had previously reached a settlement agreement that involved the disposition of securities listed on the Toronto Stock Exchange ("TSX") on the basis that RDX was believed to be indemnified by CWT for the GEM cause of action. (DS, p. 16; Dec., ¶ 25). At the

time of the settlement agreement RDX was not aware of the full extent or particularity of the fraud committed by CWT or GEM's knowledge and promotion of the same. (*Id.*).

22.  RDX and GEM had executed a confidential settlement agreement on September 22, 2014. Subsequently the settlement agreement failed for numerous reasons, one of them being that the TSX did not accept the terms of the settlement agreement with respect to securities on its exchange and GEM did not adhere to the TSX terms. (DS, p. 16; Dec., ¶ 26).

23.  Notwithstanding the same, CWT Canada II Limited Partnership (as third-party plaintiffs) ("CWT") obtained a judgment against Debtor in the amount of $7,033,491.13 on September 7, 2016. (DS, p. 16; Dec., ¶ 27).

24.  In the same First Action, CWT obtained a judgment for interest and expenses against the Debtor in the amount of $649,131.09 on March 7, 2017. (DS, p. 17; Dec., ¶ 28).

25.  There are two separate appeals pending in the First Action. The first appeal is from a contempt Order dated June 3, 2016, and the second appeal is from a contempt order and warrant for arrest dated November 8, 2017. (DE 30; DS, p. 16; Dec., ¶ 29).

26.  In August 2014, RDX filed suit against CWT in the Court of Queen's Bench of Alberta for a variety of causes including fraud arising from the Plant purchase and the requirement that CWT indemnify RDX against actions from GEM. *Id.* This case is pending and is going forward as CWT has attorned to the jurisdiction and Judge Campbell has also indicated that is the correct jurisdiction where the claims against CWT are being prosecuted ("Canadian Action"). (Dec., ¶ 30).

27.  On or about August 8, 2018, RDX filed in the Canadian Action an Amended Statement of Claim (that incorporated the newly discovered evidence by Debtor which is also being presented to the Court in New York in the Rule 5015 set aside motion) and set forth the damage claim at $80,000,000. (Amended Statement of Claim, p. 13). (Dec., ¶ 31).

28.  In 2015, GEM filed another lawsuit against Debtor (and others) in New York, styled

*GEM Holdco, LLC et al. v. RDX Technologies Corp.*, Index 653694/2015, New York Supreme Court, County of New York ("Second Action"). Summary judgment by default was entered on June 20, 2017 against Debtor in the amount of $9,023,534.49, and the Second Action is currently being appealed. (DE 30; DS, p. 17; Dec., ¶ 32).

29.     In 2016, CWT filed a lawsuit against the Debtor (and others) in the United State District Court District of Arizona, styled *CWT Canada II LP et al. v. Elizabeth Danzik et al.*, 2:16-cv-00607-DGC. RDX asserted its claims against CWT in this same forum and the various matters between the parties were consolidated before Judge Campbell. (DE 30; DS, p. 17; Dec., ¶ 33).

30.     Because of the pending nature of the Canadian Action, Judge Campbell dismissed RDX's claims in the District Court of Arizona:

> The Court finds it appropriate for these claims to be litigated in Canada given that Plaintiffs themselves filed the Canada Action long before they filed this action, the claims in the Canada Action are essentially identical to those in this action, see Dennis Doc. 60-8, many of the parties involved are Canadian, and, as Plaintiffs argued in both the Canada Action and the New York Action, the parties "agreed to an exclusive and mandatory forum selection clause conferring jurisdiction upon the courts of Alberta" for claims "arising out of or relating to" the UPA. See Dennis Doc. 60-13 at 16-21; Dennis Doc. 60-8 at 3. Moreover, Plaintiffs present no evidence to suggest that the Canadian court lacks jurisdiction or is an inadequate forum. (Campbell Order; Dec., ¶ 34).

### 2.     Debtor's Operation.

31.     The combination of the drop in the price of oil (from approximately $100 a barrel to $30 in 2015) upon which Debtor's business depended and the loss and dissipation of capital as a result of the fraudulent Plant purchase and ensuing expensive litigation led to Debtor's wastewater treatment business stopping operations on or about spring of 2015. (Dec., ¶ 35).

32.     Debtor subsequently sought Chapter 11 protection, Case No. 15-bk-15859, but did not have the outside capital and investment, and the recovery in oil price, necessary to successfully reorganize and subsequently agreed to dismiss the case. (DE 143, Case No. 15-bk-15859). (Dec., ¶ 36).

33.     In 2017, the price of oil recovered and Debtor attracted third parties willing to provide capital to restart Debtor's waste water treatment business. (Dec., ¶ 37).

34.     On December 5, 2017, Debtor commenced the present Chapter 11 proceeding to reorganize the affairs of Debtor and restart Debtor's wastewater treatment business. (DE 1; Dec., ¶ 38).

35.     The Debtor filed its Plan and Disclosure Statement in Support of the Plan on April 4, 2018 (DE 49, 50; Dec., ¶ 39).

36.     The Plan provides the Debtor will receive $500,000 from Induction Energy Corporation and $150,000 from Environmental Technologies Corporation (collectively, "New Value") for a total of $650,000 on the Effective Date to be used to restart the Debtor's wastewater treatment business. (DS, Exhibit 5; Plan, Section 7.1; Dec., ¶ 40).

37.     The New Value will be sufficient to enable Debtor to restart its wastewater treatment business. (Dec., ¶ 41).

38.     Debtor's restarted wastewater business will generate $20,000,000+ gross profits in the first five years. (DS, Exhibit 5; Dec., ¶ 42).

39.     Debtor plans to conduct business with its Trade Vendors as identified in Exhibit 6 of the Disclosure Statement as part of its restarted business and the said vendors will receive significant revenues from the same. (DS, Exhibit 6; Dec., ¶ 43).

40.     Debtor will need to reestablish its business relationships with the trade vendors by using best efforts to make the most payments it can to unsecured creditors in excess of the amount they would receive if the Debtor just liquidated. (Dec., ¶ 44).

41.     The payments that would be made to the Trade Vendors under the Plan (pro-rata payments from $3,391,196) are far superior (over ten times more) to the amount that would be paid in a liquidation (pro-rata payments from $296,324.84). (DS, Exhibit 1, Plan, Article 6; DS, Exhibit 2; Dec., ¶ 45).

42.     Debtor believes that using such best efforts will demonstrate good faith to Trade

- 12 -

Vendors and will reestablish those business relationships going forward. (Dec., ¶ 46).

43.     Debtor's Projections show aggregate business expenses of approximately $14 million, much of which will be paid as revenues to Trade Vendors that resume a business relationship with Debtor going forward. (DS, Exhibit 5; Dec., ¶ 47).

44.     Debtor is dependent on the services and goods provided by the Trade Vendors to generate the projected revenue of $20+ million. (DS, Exhibit 5; Dec., ¶ 48).

## B.     Separate Classification of Unsecured Claims.

### 1.     Trade Vendors.

45.     Numerous Trade Vendors accumulated claims through the cessation of Debtor's operation in 2015. These Trade Vendors are identified in Exhibit 6 of Disclosure Statement. (DS, Exhibit 6; Dec., ¶ 49).

46.     The Trade Vendors will provide the narrow type of goods and services necessary for the resumption of Debtor's wastewater treatment business. (Dec., ¶ 50).  The Trade Vendors are not simple workers that can be easily replaced; they are Debtor's only reasonable business option offering specific services in a finite geographical area. *Id.*

47.     The resumption of Debtor's trade relationship with the trade vendors is necessary for Debtor's operations to restart, to operate and generate the revenues set forth in Debtor's Plan Projections, and thereby make the $3,391,196 of payments to creditors proposed in the Plan. (DS, Exhibit 1, Plan, Article 6; DS, Exhibit 5; Dec., ¶ 51).

48.     The Trade Vendors are actual businesses that Debtor will need to use for post-confirmation activities and who will receive economic benefits beyond their plan payments. (Dec., ¶ 52).

49.     Debtor must conduct business with the Trade Vendors to operate its wastewater treatment business and generate the income needed to make Plan payments and make Plan payments to the creditors. (Dec., ¶ 53).

50.     The Trade Vendors will have the opportunity to receive substantial business revenue from the restarted operation of Debtor's wastewater treatment business. (Dec., ¶ 54). Debtor's Plan Projections identify approximately $14,150,336 in business expenses over the next five years and much of it will be paid to the Trade Vendors that resume business with Debtor. (DS, Exhibit 5; Dec., ¶ 54).

### 2.     Litigation Creditors.

51.     The Canadian Lawsuit is pending in Alberta, Canada against CWT for a variety of claims including fraud. (Amended Statement of Claim; Dec., ¶ 55).

52.     Debtor's monetary claim as of August 8, 2018 in the Canadian Lawsuit is $80,000,000. (Amended Statement of Claim; Dec., ¶ 56).

53.     If Debtor prevails in the Canadian Lawsuit, it will be a source of funds for Debtor to pay off creditors and fund operational growth. (Dec., ¶ 57).

54.     The Arizona District Court filed by Debtor and Danzik was dismissed to allow all claims to be heard in the Canadian Lawsuit as the claims are identical. (Campbell Order; Dec., ¶ 58).

55.     The CWT Judgment is subject to a pending *Order to Show Cause to Set Aside* pursuant to CPLR 5015, New York Civil Practice Law & Rules. (OSC; Memorandum in Support of OSC; Dec., ¶ 59).

56.     CWT has filed a response in the matter and the OSC is currently pending. (Dec., ¶ 60).

57.     A companion OSC regarding GEM's Judgment will be filed upon disposition of the OSC as to CWT. (Dec., ¶ 61).

58.     The GEM Judgment is currently being appealed and it is pending before the Appellate Division of the Supreme Court of the State of New York. (DS, p. 17; Dec., ¶ 62).

59.     The outcomes of these lawsuits and litigation will affect the allowance and payment of the Litigation Creditors' claims. (Dec., ¶ 63).

60. The Litigation Creditors' claims are also have equity interests in Debtor. CWT and RRC have affiliate and insider status with Debtor as a part of the acquisition of the Plant and became approximately 25.5% and 8.5%, respectively, equity holders in Debtor. (DE 28; Dec., ¶ 64). Also, as a consequence of that transaction, CWT and RRC principals and officers became RDX directors. (*Id.*).

### 3. Dennis Danzik as a Third-Party Source of Payment.

61. Debtor's Proprietary Technology was developed by Dennis Danzik ("Danzik"), who remains to this day critical for its deployment and ongoing development. (DS, p. 14; Dec., ¶ 65).

62. For that reason Danzik will be retained as a consultant and he will be charging the Debtor consulting fees, either directly or through an operating entity, for his assistance in deploying and developing the Proprietary Technology in an amount of approximately $185,000.00 a year going forward. (DS, p. 21-22; Dec., ¶ 66).

63. Danzik's disclosed fees are set forth in the Cost of Goods Sold section of the five year Financial Projections attached as Exhibit 5 to the Disclosure Statement and add up over the course of five years to be an aggregate of approximately $925,000. (DS, Exhibit 5; Dec., ¶ 67).

64. Debtor does not anticipate the relationship with Danzik ending abruptly after five years and projects as likely that it will be receiving the same services and paying at least the same $925,000 in fees or potentially more to Danzik over the next five years after that. (Dec., ¶ 68).

65. Danzik is a co-debtor with Debtor on the CWT and GEM Judgments and claims. (DE 48; Dec., ¶ 69).

66. Danzik's minimum projected income of $185,000 a year is a significant alternative source of payment for the co-creditors he shares with RDX, CWT and GEM. (Dec., ¶ 70).

67. Danzik's minimum projected future income of $185,000 a year will be a significant source of recovery for the co-creditors he shares with RDX regardless of how is other

assets are disposed of in his pending Chapter 11 proceeding, District of Wyoming, Case No. 17-20934. (Dec., ¶ 71).

68.     Independent of any assets part of his current bankruptcy estate, Danzik will receive payments of approximately $185,000 a year from Debtor for the next five years, and potentially more thereafter, in consulting fees, that would be a significant source of recovery for GEM and CWT. (DS, Exhibit 5; Dec., ¶ 72).

**C.     Accepting Impaired Classes.**

69.     Debtor has three accepting impaired classes: Class 4, Class 5, and Class 6. The Trade Vendors, general unsecured creditors, and the equity security holders all voted in favor of the Plan. (DE 97; Dec., ¶ 73).

70.     Prior to the confirmation hearing, Debtor amended its schedules to remove the "disputed" designation from GT's claim, thus at the confirmation hearing, GT had an allowed claim and was entitled to vote on the Plan. (DE 96; Dec., ¶ 74).

71.     The only class to reject the Plan is Class 3, the Litigation Creditors' class. (DE 97; Dec., ¶ 75).

72.     Debtor disputed and filed objections to the Litigation Creditors' claims that had not been resolved as of the confirmation hearing. (DE 98, 100, 102, 104; Dec., ¶ 76).

73.     The Litigation Creditors did not seek temporary allowance to vote their claims. (Dec., ¶ 77).

DATED this 6th day of September, 2018.

LAW OFFICE OF MARK J. GIUNTA

By   /s/  Mark J. Giunta SBN 015079
    Mark J. Giunta, Esq.
    Liz Nguyen, Esq.
    *Attorneys for Debtor*

A Copy of the foregoing was electronically filed
This 6th day of September, 2018 with the U.S. Bankruptcy Court.

COPY of the foregoing mailed (and/or served via
fax* or e-mail** if so marked) 6th day of September, 2018, to:

J. Henk Taylor *htaylor@rrulaw.com
RYAN RAPP & UNDERWOOD, P.L.C.
3200 North Central Avenue, Suite 2250
Phoenix, Arizona 85012
*Attorney for CWT Canada II LP*

Christopher J. Pattock
*christopher.j.pattock@usdoj.gov
Office of the United States Trustee
230 North First Avenue, Suite 204
Phoenix, Arizona 85003

Joshua Wurtzel *jwurtzel@schlamstone.com
Jeffrey M. Eilender
*jeilender@schlamstone.com
Bradley J. Nash *bnash@shalamstone.com
Schlam Stone and Dolan LLP
26 Broadway
New York, NY 10004
*Attorneys for CWT Canada II LP*

Robert R. Kinas, Esq. *rkinas@swlaw.com
Snell & Wilmer, LLP
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169
*Attorney for Butterball, LLC*

Emily Wagner, Esq. *ewagner@swlaw.com
Snell & Wilmer, LLP
One Arizona Center
400 East Van Buren Street, Suite 1900
Phoenix, Arizona 85004
*Attorney for Butterball, LLC*

United States Trustee
230 North First Avenue, Suite 204
Phoenix, AZ  85003-1706

Logan Schutz _____

# EXHIBIT 1

Mark J. Giunta (#015079)
Liz Nguyen (#030282)
Law Office of Mark J. Giunta
531 East Thomas Road, Suite 200
Phoenix, Arizona 85012
Phone (602) 307-0837
Fax (602) 307-0838
Email markgiunta@giuntalaw.com
Email liz@giuntalaw.com

*Attorneys for Debtor*

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>RDX TECHNOLOGIES CORPORATION,<br><br>Debtor. | Chapter 11 Proceeding<br><br>Case No. 2:17-bk-14387-PS<br><br>**DECLARATION OF ANTHONY KER IN SUPPORT OF DEBTOR'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT ON PLAN CONFIRMATION**<br><br>Hearing Date:     October 2, 2018<br>Hearing Time:     11:00 a.m.<br>Hearing Location:   Courtroom 601 |

I, Anthony Ker, make the following declaration:

1.     This Declaration is based upon my personal knowledge. I am the CEO of Debtor RDX Technologies Corporation ("Debtor").

**A.     CONTROVERTING FACTS.**

2.     Debtor controverts paragraph 3 of the OSOF and believes the actual amount should be $7,682,622.

3.     Debtor controverts paragraph 5 of the OSOF and believes the actual amount should be $7,682,622.

4.     Debtor controverts paragraph 10 of the OSOF because the Debtor believes it to be $9,023,534,.49

**B.    AFFIRMATIVE FACTS.**

**1.    RDX Business Background.**

5.    RDX Technologies Corporation ("RDX") is a foreign corporation domiciled in Canada since its incorporation on or about July 30, 2003[1].

6.    Debtor had operated an environmental service business in Alberta and a wastewater treatment business for customers in the oil fracking industry. Debtor directly provided the wastewater treatment service to customers located in Canada, while a wholly owned United States subsidiary of Debtor, Ridgeline Energy Services (USA), Inc. ("Ridgeline USA"), provided the same waste water service to customers located in the United States. (DS).

7.    RDX's wastewater treatment business was for a time successful at its height generating approximately $CDN 30 MILLION in annual revenues in 2014. (DS).

8.    Due to the two negative events of the collapse of oil (from over $100 a barrel to less than $30 a barrel in 2015) and RDX's acquisition of a fraudulent recycling Plant and ensuing litigation and expenses therefrom, Debtor became insolvent and subsequently sought bankruptcy protection. (DS).

9.    Debtor and its subsidiary used a proprietary process and technology, i.e., trade secrets (hereinafter "Proprietary Technology"), in the delivery of the wastewater treatment service. (DS).

10.    The Trade Vendors set forth in Exhibit 6 of the Disclosure Statement and comprising Class 4 of the Plan provided critical goods and support for the deployment of the Proprietary Technologies in RDX's wastewater treatment business and prior to Debtor's insolvency receiving substantial revenues on account of the same. (DS, Exhibit 1, Plan and Exhibit 6, Trade Vendor List).

11.    Upon Debtor restarting its wastewater treatment business, the Trade Vendors have

the opportunity to generate and receive substantial revenues from Debtor going forward. (DS, Exhibit 5, Projections).

## 2. Fraudulent Diesel Fuel Recycling Plant Purchase and Resulting Litigation and Claims.

12. On or about May 2013, Debtor entered into an agreement to purchase a plant (the "Plant") to process waste products into renewable fuel that would qualify under the Energy Policy Act for fuel tax credits from Changing World Technologies, L.P., a Delaware limited partnership ("CWT Affiliate"). The purchase was to include the acquisition of all the equity of CWT (which owned and operated the Plant) and the wholly owned subsidiary Resource Environmental Solutions (RES) which had the rights to collect on the fuel tax credits. A true and correct copy of the Unit Purchase Agreement is attached hereto as **Exhibit A**.

13. The affiliation between GEM and the CWT Affiliate is that Ed Tobin was an officer of both entities and controlled the operation of the Plant on behalf of CWT. GEM was a minority owner of the CWT Affiliate (approximately 30%) and was active in the CWT Affiliate's management and efforts to promote the sale of the CWT Affiliate's business (the CWT Plant) to RDX. Ed Tobin made initial contact with Debtor regarding the acquisition of the Plant and promoted the same.

14. The CWT acquisition was anticipated to complement the RDX wastewater treatment technology. The RDX technology would collect wastewater with oils, fats and grease in the water.

15. The RDX technology would strip out the oil, fat and grease and treat the water for cleaner disposal. The CWT Missouri facility and the associated technology was represented to convert the oils, fats and grease collected by the RDX technology and convert it to a Renewable diesel eligible for the federal program of RINS and tax credit for the production and sale of

---

[1] The Debtor's original corporate name was "Ridgeline Energy Services Inc." until it was changed to "RDX

renewable diesel.

16.     After the Plant purchase, users of the recycled fuel reported to Debtor that the quality of fuel produced was so bad that it caused significant problems by destroying their fuel handling equipment. Debtor was required to spend significant funds to fix the problem.

17.     Debtor subsequently learned that the Plant was incapable of producing a qualifying renewable fuel prevented Debtor from collecting financial incentives in the form of RINs and tax credits that was the only reason for profitability of the Plant.

18.     Debtor attempted to produce a non-qualifying product to be sold at a significantly reduced price without the financial incentives of the qualifying product. However, when the price of oil dropped significantly in late 2014, Debtor could not produce the non-qualifying fuel at a profit.

19.     RDX losing the ability to sell qualifying fuel reduced the effective revenues to the CWT refinery of between 40-50%, effectively making any fuel produced to done at a loss. Coupled with the damage the fuel did to clients' equipment meant RDX had to complete over a $1,000,000 of repairs to the customers equipment.

20.     Litigation amongst the various parties resulted as a consequence of the Plant's inability to produce recycled fuel and the expense of the litigation and exorbitant cost bond effectively drained any funds from Debtor.

21.     Much later in 2017, after certain litigation had occurred, Debtor discovered new evidence establishing with particularity how CWT's prior operation of the Plant, procurement of fuel tax credits, and its subsequent sale to Debtor was a fraud on the United States Government and Debtor. The former plant manager detailed the instrumentality of the fraud in a sworn affidavit including the use of purposely manipulated independent laboratory analysis. That fraud was compounded by a subsequent concealment of evidence and obstruction in the ensuing

Technologies Corporation" on 21 August 2013.

Case 2:17-bk-14387-PS     Doc 118     Filed 09/06/18     Entered 09/06/18 18:57:27     Desc
Main Document     Page 22 of 30

litigation regarding the Plant by an agent of CWT.

22.     The New York judgment was a default judgment awarded and all RDX's defenses struck, because RDX failed to deliver discovery materials to the court. The new evidence found in 2017 shows that the CFO Candie Blazar had conspired to destroy, hide or steal the discovery material and conspired with CWT to do so. The result was that RDX could not have satisfied the court ordered discovery requests. The new evidence found forms the basis for the 5015 filing in New York so that the judgments are vacated and that RDX get another chance to have a fair hearing.

23.     In order to comply with, and mitigate or avoid any taxing authority claims against Debtor related to this activity by the predecessor Plant owner, it is in Debtor's legal and economic interest to develop and present these facts related to this fraud. Through counsel, Debtor has been in discussion with IRS Special Agents regarding a Whistle Blower action.

24.     In 2013, GEM Holdco, LLC ("GEM") filed a lawsuit against Debtor (and others) in New York, styled *GEM Holdco, LLC et al. v. CWT Canada II Limited Partnership et al.*, Index 650841/2013, New York Supreme Court, County of New York ("First Action").

25.     RDX and GEM had previously reached a settlement agreement that involved the disposition of securities listed on the Toronto Stock Exchange ("TSX") on the basis that RDX was believed to be indemnified by CWT for the GEM cause of action. At the time of the settlement agreement RDX was not aware of the full extent or particularity of the fraud committed by CWT or GEM's knowledge and promotion of the same.

26.     RDX and GEM had executed a confidential settlement agreement on September 22, 2014. Subsequently the settlement agreement failed for numerous reasons, one of them being that the Toronto Stock Exchange ("TSX") did not accept the terms of the settlement agreement with respect to securities on its exchange and GEM did not adhere to the TSX terms.

27.     Notwithstanding the same, CWT Canada II Limited Partnership (as third-party

plaintiffs) ("CWT") obtained a judgment against Debtor in the amount of $7,033,491.13 on September 7, 2016.

28. In the same First Action, CWT obtained a judgment for interest and expenses against the Debtor in the amount of $649,131.09 on March 7, 2017.

29. There are two separate appeals pending in the First Action. The first appeal is from a contempt Order dated June 3, 2016, and the second appeal is from a contempt order and warrant for arrest dated November 8, 2017. (DE 30).

30. In August 2014, RDX filed suit against CWT in the Court of Queen's Bench of Alberta for a variety of causes including fraud arising from the Plant purchase and the requirement that CWT indemnify RDX against actions from GEM. This case is pending and is going forward as CWT has attorned to the jurisdiction and Judge Campbell has also indicated that is the correct jurisdiction where the claims against CWT are being prosecuted ("Canadian Action").

31. On or about August 8, 2018, RDX filed in the Canadian Action an Amended Statement of Claim (that incorporated the newly discovered evidence by Debtor which is also being presented to the Court in New York in the Rule 5015 set aside motion) and set forth the damage claim at $80,000,000. A true and correct copy of the Amended Statement of Claim is attached hereto as **Exhibit B**.

32. In 2015, GEM filed another lawsuit against Debtor (and others) in New York, styled *GEM Holdco, LLC et al. v. RDX Technologies Corp.*, Index 653694/2015, New York Supreme Court, County of New York ("Second Action"). Summary judgment by default was entered on June 20, 2017 against Debtor in the amount of $9,023,534.49, and the Second Action is currently being appealed. (DE 30).

33. In 2016, CWT filed a lawsuit against the Debtor (and others) in the United State District Court District of Arizona, styled *CWT Canada II LP et al. v. Elizabeth Danzik et al.*,

2:16-cv-00607-DGC. RDX asserted its claims against CWT in this same forum and the various matters between the parties were consolidated before Judge Campbell.

34.    Because of the pending nature of the Canadian Action, Judge Campbell dismissed RDX's claims in the District Court of Arizona. A true and correct copy of the District Court Order ("Campbell Order") is attached hereto as **Exhibit C**.

      **2.    Debtor's Operation.**

35.    The combination of the drop in the price of oil (from approximately $100 a barrel to $30 in 2015) upon which Debtor's business depended and the loss and dissipation of capital as a result of the fraudulent Plant purchase and ensuing expensive litigation led to Debtor's wastewater treatment business stopping operations on or about spring of 2015.

36.    Debtor subsequently sought Chapter 11 protection, Case No. 15-bk-15859, but did not have the outside capital and investment, and the recovery in oil price, necessary to successfully reorganize and subsequently agreed to dismiss the case. (DE 143, Case No. 15-bk-15859).

37.    In 2017, the price of oil recovered and Debtor attracted third parties willing to provide capital to restart Debtor's waste water treatment business.

38.    On December 5, 2017, Debtor commenced the present Chapter 11 proceeding to reorganize the affairs of Debtor and restart Debtor's wastewater treatment business. (DE 1).

39.    The Debtor filed its Plan and Disclosure Statement in Support of the Plan on April 4, 2018 (DE 49, 50).

40.    The Plan provides the Debtor will receive $500,000 from Induction Energy Corporation and $150,000 from Environmental Technologies Corporation (collectively, "New Value") for a total of $650,000 on the Effective Date to be used to restart the Debtor's wastewater treatment business. (DS, Exhibit 5; Plan, Section 7.1).

41.    The New Value will be sufficient to enable Debtor to restart its wastewater

treatment business.

42. Debtor's restarted wastewater business will generate $20,000,000+ gross profits in the first five years. (DS, Exhibit 5).

43. Debtor plans to conduct business with its Trade Vendors as identified in Exhibit 6 of the Disclosure Statement as part of its restarted business and the said vendors will receive significant revenues from the same. (DS, Exhibit 6).

44. Debtor will need to reestablish its business relationships with the trade vendors by using best efforts to make the most payments it can to unsecured creditors in excess of the amount they would receive if the Debtor just liquidated.

45. The payments that would be made to the Trade Vendors under the Plan (pro-rata payments from $3,391,196) are far superior (over ten times more) to the amount that would be paid in a liquidation (pro-rata payments from $296,324.84). (DS, Exhibit 1, Plan, Article 6; DS, Exhibit 2).

46. Debtor believes that using such best efforts will demonstrate good faith to Trade Vendors and will reestablish those business relationships going forward.

47. Debtor's Projections show aggregate business expenses of approximately $14 million, much of which will be paid as revenues to Trade Vendors that resume a business relationship with Debtor going forward. (DS, Exhibit 5).

48. Debtor is dependent on the services and goods provided by the Trade Vendors to generate the projected revenue of $20+ million.

**B.    Separate Classification of Unsecured Claims.**

**1.    Trade Vendors.**

49. Numerous Trade Vendors accumulated claims through the cessation of Debtor's operation in 2015. These Trade Vendors are identified in Exhibit 6 of Disclosure Statement. (DS, Exhibit 6).

50.     The Trade Vendors will provide the narrow type of goods and services necessary for the resumption of Debtor's wastewater treatment business. The Trade Vendors are not simple workers that can be easily replaced; they are Debtor's only reasonable business option offering specific services in a finite geographical area.

51.     The resumption of Debtor's trade relationship with the trade vendors is necessary for Debtor's operations to restart, to operate and generate the revenues set forth in Debtor's Plan Projections, and thereby make the $3,391,196 of payments to creditors proposed in the Plan. (DS, Exhibit 1, Plan, Article 6; DS, Exhibit 5).

52.     The Trade Vendors are actual businesses that Debtor will need to use for post-confirmation activities and who will receive economic benefits beyond their plan payments.

53.     Debtor must conduct business with the Trade Vendors to operate its wastewater treatment business and generate the income needed to make Plan payments and make Plan payments to the creditors.

54.     The Trade Vendors will have the opportunity to receive substantial business revenue from the restarted operation of Debtor's wastewater treatment business. Debtor's Plan Projections identify approximately $14,150,336 in business expenses over the next five years and much of it will be paid to the Trade Vendors that resume business with Debtor. (DS, Exhibit 5).

## 2.     Litigation Creditors.

55.     The Canadian Lawsuit is pending in Alberta, Canada against CWT for a variety of claims including fraud. (Amended Statement of Claim).

56.     Debtor's monetary claim as of August 8, 2018 in the Canadian Lawsuit is $80,000,000. (Amended Statement of Claim).

57.     If Debtor prevails in the Canadian Lawsuit, it will be a source of funds for Debtor to pay off creditors and fund operational growth.

58.     The Arizona District Court filed by Debtor and Danzik was dismissed to allow all

- 9

claims to be heard in the Canadian Lawsuit as the claims are identical. (Campbell Order).

59. The CWT Judgment is subject to a pending Order to Show Cause to Set Aside pursuant to CPLR 5015, New York Civil Practice Law & Rules. True and correct copies of the Order to Show Cause ("OSC") and the Memorandum in Support of OSC are attached hereto respectively as **Exhibits D and E**.

60. CWT has filed a response in the matter and the OSC is currently pending.

61. A companion OSC regarding GEM's Judgment will be filed upon disposition of the OSC as to CWT.

62. The GEM Judgment is currently being appealed and it is pending before the Appellate Division of the Supreme Court of the State of New York. (DE 30).

63. The outcomes of these lawsuits and litigation will affect the allowance and payment of the Litigation Creditors' claims.

64. The Litigation Creditors' claims are also have equity interests in Debtor. CWT and RRC have affiliate and insider status with Debtor as a part of the acquisition of the Plant and became approximately 25.5% and 8.5%, respectively, equity holders in Debtor. Also, as a consequence of that transaction, CWT and RRC principals and officers became RDX directors.

**3. Dennis Danzik as a Third-Party Source of Payment.**

65. Debtor's Proprietary Technology was developed by Dennis Danzik ("Danzik"), who remains to this day critical for its deployment and ongoing development. (DS).

66. For that reason Danzik will be retained as a consultant and he will be charging the Debtor consulting fees, either directly or through an operating entity, for his assistance in deploying and developing the Proprietary Technology in an amount of approximately $185,000.00 a year going forward. (DS).

67. Danzik's disclosed fees are set forth in the Cost of Goods Sold section of the five year Financial Projections attached as Exhibit 5 to the Disclosure Statement and add up over the

Case 2:17-bk-14387-PS    Doc 118    Filed 09/06/18    Entered 09/06/18 18:57:27    Desc
Main Document    Page 28 of 30

course of five years to be an aggregate of approximately $925,000. (DS, Exhibit 5).

68.     Debtor does not anticipate the relationship with Danzik ending abruptly after five years and projects as likely that it will be receiving the same services and paying at least the same $925,000 in fees or potentially more to Danzik over the next five years after that.

69.     Danzik is a co-debtor with Debtor on the CWT and GEM Judgments and claims.

70.     Danzik's minimum projected income of $185,000 a year is a significant alternative source of payment for the co-creditors he shares with RDX, CWT and GEM.

71.     Danzik's minimum projected future income of $185,000 a year will be a significant source of recovery for the co-creditors he shares with RDX regardless of how is other assets are disposed of in his pending Chapter 11 proceeding, District of Wyoming, Case No. 17-20934.

72.     Independent of any assets part of his current bankruptcy estate, Danzik will receive payments of approximately $185,000 a year from Debtor for the next five years, and potentially more thereafter, in consulting fees, that would be a significant source of recovery for GEM and CWT. (DS, Exhibit 5).

**C.     Accepting Impaired Classes.**

73.     Debtor has three accepting impaired classes: Class 4, Class 5, and Class 6. The Trade Vendors, general unsecured creditors, and the equity security holders all voted in favor of the Plan. (DE 97).

74.     Prior to the confirmation hearing, Debtor amended its schedules to remove the "disputed" designation from GT's claim, thus at the confirmation hearing, GT had an allowed claim and was entitled to vote on the Plan. (DE 96).

75.     The only class to reject the Plan is Class 3, the Litigation Creditors' class. (DE 97).

76.     Debtor disputed and filed objections to the Litigation Creditors' claims that had not been resolved as of the confirmation hearing. (DE 98, 100, 102, 104).

77.     The Litigation Creditors did not seek temporary allowance to vote their claims.

DATED this 6th day of September, 2018.

_____
Anthony Ker